690 F.2d 753
 18 ERC 1149, 40 Fed.R.Serv.2d 928, 13
Envtl. L. Rep. 20,092
 STATE OF CALIFORNIA, Plaintiff-Appellee,
v.
John R. BLOCK*, in his official capacity as
Secretary of the United States Department of
Agriculture; et al., Defendant-Appellants.
County of Del Norte, a political subdivision of the State of
California, et al., Defendant-Intervenor-Appellants.
 Nos. 80-4101, 80-4111, 80-4112, 80-4115 and 80-4218.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Sept. 17, 1981.
Decided Oct. 22, 1982.
 
 Robin L. Rivett, Sacramento, Cal., Jared G. Carter, Rawles, Hinkle, Finnegan, Carter & Brigham, Ukiah, Cal., David Booth Beers, Robert L. Klarquist, Dept. of Justice, Washington, D. C., for Bergland.
 Edna Walz, Asst. Atty. Gen., Sacramento, Cal., argued for plaintiff-appellee; Francia M. Welker, Fort Bragg, Cal., on brief.
 Trent W. Orr, San Francisco, Cal., for Natural Resource Defense Council.
 Appeal from the United States District Court for the Eastern District of California.
 Before TANG and ALARCON, Circuit Judges and KELLAM**, District Judge.
 TANG, Circuit Judge:
 
 
 1
 This appeal is from a summary judgment and injunction entered against the Forest Service for failing to comply with the National Environmental Policy Act, 42 U.S.C. §§ 4331-4332 (1976), in preparing an environmental impact statement ("EIS") on a Forest Service decision to allocate National Forest System land among three management categories. Four principal issues are raised. Did the district court err in holding that:
 
 
 2
 (1) the Final EIS did not contain an adequate discussion of the site-specific environmental consequences of the allocations?
 
 
 3
 (2) the Final EIS did not consider an adequate range of alternatives?
 
 
 4
 (3) the Forest Service did not give the public an adequate opportunity to comment on the proposed allocations?(4) the National Forest Management Act, 16 U.S.C. § 1604 (1976), did not exempt the disputed allocations from review under the National Environmental Policy Act?
 
 
 5
 We affirm in part and reverse in part.
 
 FACTS
 
 6
 This litigation concerns how the Forest Service intends to manage 62 million acres of the National Forest System. The National Forest System contains approximately 190 million acres, and includes 154 National Forests and 19 National Grasslands. The Forest Service is charged additionally with administering a large portion of the National Wilderness Preservation System ("NWPS"), which currently includes more than 19 million acres. The latter system was created by Congress in 1964 to provide statutory protection for areas that are relatively untouched by humankind. 16 U.S.C. § 1131 (1976).[1] Under the mandate of the enabling legislation, the Secretary of Agriculture is directed to recommend to Congress "primitive" areas that should be added to the Wilderness System. Id. at § 1132. Other legislation also obliges the Secretary to manage National Forest land to foster "multiple-use" of the system's resources, including recreation, lumbering, mining, grazing and commercial fishing.[2]
 
 
 7
 In 1972, the Forest Service made an abortive attempt to devise a national planning document for the management of "roadless areas" within the National Forest System. Dubbed "Roadless Area Review and Evaluation (RARE I)," this effort ended when a federal court enjoined development pursuant to the plan until the Forest Service completed an EIS. Wyoming Outdoor Coordinating Council v. Butz, 484 F.2d 1244 (10th Cir. 1973).
 
 
 8
 In 1977, the Forest Service made a second attempt to evaluate programmatically the roadless areas in the National Forest System. This project, named RARE II, inventoried all roadless areas within the National Forest System and allocated each area to one of three planning categories: Wilderness, Further Planning and Nonwilderness. Areas designated as Wilderness were to be recommended to Congress for inclusion in the NWPS. A Further Planning designation meant that an area would be protected pending completion of unit management plans which would consider whether to recommend the area for inclusion in the NWPS. No controversy surrounds the Wilderness or Further Planning designations. The parties here dispute what a Nonwilderness designation means.
 
 
 9
 A draft EIS on the RARE II project was released to the public on June 15, 1978. The document consisted of a national planning description and twenty state and geographic area supplements. It identified ten alternative allocation methods which resulted in different allocations between the three planning categories, but did not tentatively endorse any of the alternatives as a Proposed Action. Each alternative reflected a different combination of decisional criteria. The criteria included Forest Service resource planning goals, wilderness attributes, public accessibility to wilderness areas, public comment and the economic effects of Wilderness classification. See Appendix, infra.
 
 
 10
 Public comment was solicited concerning the decisional criteria, the allocations that resulted from the alternatives, and possible alternative approaches not considered in the draft. The draft EIS prompted over 264,000 comments.
 
 
 11
 The Final EIS was filed on January 4, 1979. It identified for the first time the Forest Service's Proposed Action and called for allocating 15 million acres of RARE II lands to Wilderness, 10.8 million acres to Further Planning, and 36 million acres to Nonwilderness. See Forest Service, U. S. Dep't of Agriculture, RARE II Final Environmental Impact Statement, Roadless Area Review and Evaluation 37 (1979) (hereinafter cited as "RARE II Final EIS"). The Proposed Action was not one of the alternatives considered in the draft EIS, but represented an amalgam of all the decisional criteria considered in the draft EIS alternatives. See Appendix, infra. The percentage allocation produced by the Proposed Action was within the range of percentage allocations produced by the draft EIS alternatives, but was not roughly identical to any one set of allocation percentages considered in the earlier alternatives. See Table # 1, infra.
 
 
 12
 The Final EIS, unlike the earlier draft, was circulated only to Congress and to affected federal and state agencies. Its recommendations were sent to the President on May 2, 1979, who approved them after making some minor changes in the allocations. The wilderness recommendations were subsequently transmitted to Congress.
 
 
 13
 On July 25, 1979, the State of California brought action in federal district court against the Secretary of Agriculture and the Forest Service, alleging violations of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4331-4332 (1976),[3] the Multiple-Use Sustained-Yield Act ("MUSY"), 16 U.S.C. § 528 (1976), and the National Forest Management Act ("NFMA"), 16 U.S.C. § 1604 (1976). The National Resources Defense Council, Trinity County, and the Clear Creek Legal Defense Fund were granted permissive intervention on the plaintiffs' side. (These parties, along with the State of California, will henceforth be referred to collectively as "California.") The district court denied a motion by Webco Lumber Company ("Webco") to intervene as of right, but allowed permissive intervention on defendants' side to Webco, as well as to the National Forest Products Association and the Counties of Del Norte, Shasta and Siskiyou. (These parties, along with the Secretary of Agriculture and the Forest Service, will henceforth be referred to collectively as "Forest Service.")
 
 
 14
 California specifically challenged the Forest Service decision to designate forty-seven RARE II areas in California as Nonwilderness. On January 8, 1980, the district court granted California's motion for summary judgment. Without reaching the MUSY and NFMA claims, the court held that the RARE II Final EIS was inadequate to support the Nonwilderness designations of the disputed areas and therefore violated NEPA. It ruled that the Final EIS was deficient in three respects: (1) the EIS did not contain sufficient site-specific data to support the Nonwilderness designations; (2) the EIS did not consider an adequate range of alternatives; and (3) the Forest Service did not give the public an adequate opportunity to comment on the RARE II program.
 
 
 15
 Pursuant to these holdings, the district court enjoined the Forest Service from taking any action that might change the wilderness character of the disputed areas in California until it filed an EIS that satisfied NEPA's requirements and considered the impact of the decision upon the wilderness characteristics of these areas. The court excepted from its order activities that had been previously analyzed in an EIS apart from the RARE II Final EIS. The court also enjoined the Forest Service from relying upon the RARE II Final EIS in preparing forest plans pursuant to the NFMA.
 
 
 16
 The Forest Service appeals from the summary judgment and injunction. Webco appeals, inter alia, from the district court's denial of its motion to intervene as of right.
 
 DISCUSSION
 
 17
 I. Did the RARE II Final EIS adequately examine the site-specific impact of the Proposed Action?
 
 
 18
 The district court concluded that the RARE II Final EIS failed to consider adequately the site-specific impact of the RARE II decision. Specifically, the district court cited the following deficiencies:
 
 
 19
 -The EIS does not comprehensively describe any of the RARE II areas, limiting its evaluation per area to two pages of summary index numbers that do not identify the areas' unique characteristics (e.g., landmarks, rare and endangered species);
 
 
 20
 -No attempt is made to assess the wilderness value of each area (e.g., tourism, sales of wilderness oriented recreational equipment, conservation of wildlife and flora populations, soil conservation and stability, watershed protection, clean air and water);
 
 
 21
 -The EIS does not discuss the impact of Nonwilderness designations upon each area's wilderness characteristics and values (e.g., primary and secondary impacts, methods of mitigation, and environmental damage);
 
 
 22
 -The EIS does not consider the effect of development on future opportunities for wilderness classification (i.e., the effect upon the benchmark characteristics identified in the Wilderness Act);
 
 
 23
 -The EIS does not attempt to balance economic benefits of Nonwilderness designation for an area against the consequent environmental loss.
 
 
 24
 California v. Bergland, 483 F.Supp. 465, 483-87 (E.D.Cal.1980).
 
 
 25
 The Forest Service complains that the degree of detail required by the district court is unwarranted, given the tentative nature of the RARE II decision and the national scope of its impact. The central contention is that a programmatic EIS describing the first step in a multi-step national project need not contain the type of detailed site-specific information normally contained in an EIS prepared for a more narrowly focused project such as a dam or a federal mineral lease.
 
 
 26
 The adequacy of an EIS depends upon whether it was prepared in observance of the procedure required by law. 5 U.S.C. § 706(2)(D) (1976); Lathan v. Brinegar, 506 F.2d 677, 693 (9th Cir. 1974) (en banc). Under this standard of review, we employ a "rule of reason" that inquires whether an EIS contains a "reasonably thorough discussion of the significant aspects of the probable environmental consequences." Trout Unlimited, Inc. v. Morton, 509 F.2d 1276, 1283 (9th Cir. 1974). This standard is not susceptible to refined calibration. It instead requires a reviewing court to make a pragmatic judgment whether the EIS's form, content and preparation foster both informed decision-making and informed public participation. Warm Springs Dam Task Force v. Gribble, 565 F.2d 549, 552 (9th Cir. 1977) (per curiam); Trout Unlimited, Inc., 509 F.2d at 1283. This standard of review, however, does not authorize a reviewing court to substitute its judgment for that of the agency concerning the wisdom or prudence of a proposed action. Once satisfied that a proposing agency has taken a "hard look" at a decision's environmental consequences, the review is at an end. Kleppe v. Sierra Club, 427 U.S. 390, 410 n.21, 96 S.Ct. 2718, 2730 n.21, 49 L.Ed.2d 576 (1976).
 
 
 27
 The detail that NEPA requires in an EIS depends upon the nature and scope of the proposed action. See Aberdeen & Rockfish R. R. Co. v. Students Challenging Regulatory Agency Procedures, 422 U.S. 289, 322, 95 S.Ct. 2336, 2356, 45 L.Ed.2d 191 (1975). The standards normally applied to assess an EIS require further refinement when a largely programmatic EIS is reviewed. The critical inquiry in considering the adequacy of an EIS prepared for a large scale, multi-step project is not whether the project's site-specific impact should be evaluated in detail, but when such detailed evaluation should occur. County of Suffolk v. Secretary of Interior, 562 F.2d 1368, 1378 (2d Cir. 1977), cert. denied, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978).
 
 
 28
 NEPA requires that the evaluation of a project's environmental consequences take place at an early stage in the project's planning process. Friends of Earth, Inc. v. Coleman, 518 F.2d 323, 327 (9th Cir. 1975). This requirement is tempered, though, by the statutory command that we focus upon a proposal's parameters as the agency defines them. See Kleppe, 427 U.S. at 406-07, 96 S.Ct. at 2728-29. The requirement is further tempered by the preference to defer detailed analysis until a concrete development proposal crystallizes the dimensions of a project's probable environmental consequences. See id. at 402, 96 S.Ct. at 2726. When a programmatic EIS has already been prepared, we have held that site-specific impacts need not be fully evaluated until a "critical decision" has been made to act on site development. Sierra Club v. Hathaway, 579 F.2d 1162, 1168 (9th Cir. 1978). This threshold is reached when, as a practical matter, the agency proposes to make an "irreversible and irretrievable commitment of the availability of resources" to a project at a particular site. Id. at 1168; see also Environmental Defense Fund, Inc. v. Andrus, 596 F.2d 848, 852 (9th Cir. 1979).
 
 
 29
 The fundamental issue presented here is whether a "critical decision" has been made with respect to site development. The starting point in our analysis is "to describe accurately the 'federal action' being taken." Aberdeen & Rockfish R. R. Co., 422 U.S. at 322, 95 S.Ct. at 2356. The district court concluded that the RARE II decision contained two parts: (1) the Forest Services' recommendation to Congress that the Wilderness designated areas be included in the NWPS; and (2) in designing and implementing forest management plans during the next ten to fifteen years, the mandate that the Forest Service will not consider the wilderness uses or features of areas designated as Nonwilderness. California v. Bergland, 483 F.Supp. at 474-75. All parties agree that RARE II encompasses the first component. They disagree whether RARE II encompasses the second.
 
 
 30
 The Forest Service argues that the district court erred in concluding that Nonwilderness designation is tantamount to a decision to permit development. It emphasizes that the RARE II process is only the first step in a multi-stage planning process to allocate roadless areas to competing social uses. At this step, the Service contends, a RARE II Nonwilderness designation means only that the areas will not be considered for inclusion in the NWPS during the first generation of forest management plans under the NFMA, a period lasting between ten to fifteen years. In the meantime the Forest Service will entertain specific development proposals concerning these areas, but will prepare separate EIS's if federal action is contemplated and will consider wilderness values in devising forest plans for these areas. Given the limited impact of the Nonwilderness designation, the Forest Service urges that it is permissible to limit the scope of the EIS to a generalized discussion of the designations' overall impact.
 
 
 31
 California argues, and the district court agreed, that the Forest Service unfairly minimizes the consequences of the Nonwilderness designation. California and the district court decision focus upon the following Forest Service regulation pertaining to Nonwilderness designated areas:
 
 
 32
 Lands reviewed for Wilderness designation under the review and evaluation of roadless areas conducted by the Secretary of Agriculture but not designated as wilderness or designated for further planning and lands whose designation as primitive areas has been terminated will be managed for uses other than wilderness in accordance with this subpart. No such area will be considered for designation as wilderness until a revision of the forest plan under § 219.11(f) ....
 
 
 33
 36 C.F.R. § 219.12(e) (1981).
 
 
 34
 California and the district court decision interpret this regulation to mean that the Forest Service will not consider a Nonwilderness area's wilderness features for any purpose during the area's forest plan life. Thus, while an EIS on specific development proposals will consider substantial pollution effects, California argues that the Forest Service will be precluded from considering the desirability of utilizing the proposed site as a wilderness area, and will not consider wilderness features (e.g., solitude, primitive character and wilderness recreation) in assessing the environmental consequences. They conclude that if the wilderness features and values of each Nonwilderness area are ever to be individually evaluated, they must be evaluated now.
 
 
 35
 On balance, we conclude that California's description of the effect of Nonwilderness designation is more accurate and therefore affirm the district court. We agree with the Forest Service that the last sentence in the above quoted regulation only restricts the Forest Service from considering Nonwilderness areas for Wilderness designation, and does not explicitly forbid the Forest Service from considering Nonwilderness areas' wilderness features or values in devising forest plans. The sentence that precedes this clause, however, explicitly mandates that Nonwilderness areas "will be managed for uses other than wilderness." This command is not subject to any ambiguity. At least during the first generation of forest plans, Nonwilderness designated areas will be managed for purposes other than wilderness preservation. This command is repeated in the text of the Final EIS itself, which indicates that "(a)reas allocated to nonwilderness will become available on April 15, 1979, for multiple resource use activities other than wilderness." RARE II Final EIS at vi (emphasis added).
 
 
 36
 Future decisions concerning these areas will be constrained by this choice. While the regulations technically permit consideration of wilderness values and features in forest planning,[4] such consideration is pointless in the absence of the discretion to manage a Nonwilderness area in a manner consistent with wilderness preservation. Similarly, the promise of site-specific EIS's in the future is meaningless if later analysis cannot consider wilderness preservation as an alternative to development. The "critical decision" to commit these areas for nonwilderness uses, at least for the next ten to fifteen years, is "irreversible and irretrievable." The site-specific impact of this decisive allocative decision must therefore be carefully scrutinized now and not when specific development proposals are made.
 
 
 37
 The deficiencies noted by the district court are precisely the omissions the Forest Service will need to correct in order to comply fully with NEPA. The prescribed content of the EIS is delineated in the Council of Environmental Quality ("CEQ") Guidelines in effect at the time of the EIS's issuance,[5] which the Forest Service has incorporated into its own planning guidelines, see generally Forest Service NEPA Process, 43 Fed.Reg. 21254 (1978), and to which we grant "substantial deference" as the authoritative guide for NEPA's interpretation. Andrus v. Sierra Club, 442 U.S. 347, 358, 99 S.Ct. 2335, 2341, 60 L.Ed.2d 943 (1979).
 
 
 38
 First, these guidelines require that the proposing agency "describe the environment of the area affected as it exists prior to a proposed action." 40 C.F.R. § 1500.8(a)(1) (1977), 38 Fed.Reg. 20,550, 20,553 (1973) (superceded 1978). The Final EIS reflects only a feeble attempt to comply with this requirement. For each area in the RARE II inventory, the EIS contains a two page computer print-out which lists: (1) the location and acreage of the area; (2) its classification as one of forty basic landform types; (3) its Bailey-Kuchler classification as to ecosystem type; (4) the number of wilderness-associated wildlife species in the area; and (5) a competitive numerical rating score of each area's wilderness attributes. What this description fails to do is identify the distinguishing wilderness characteristics of each area. The indices utilized are simply too generalized. The Bailey-Kuchler classifications, for example, do not identify ecosystems less than 50,000 acres, yet many of the areas are smaller than this limit and contain a variety of different habitats. Similarly, while the EIS lists wildlife numbers, it reveals nothing concerning wildlife types and quantity, or whether rare and endangered wildlife species exist in a particular area.
 
 
 39
 The Wilderness Attribute Rating System ("WARS") score is even less informative. The WARS score utilized four distinct factors identified in the Wilderness Act (naturalness, apparent naturalness, opportunity for solitude, and opportunity for a primitive recreation experience) and assigned a numerical rating to each area from one to seven, depending on the degree of naturalness or opportunity exhibited. The four factors rated were combined to give a potential WARS score from four to twenty-eight for each area, and then the area score was competitively ranked against the WARS scores assigned to all other roadless areas. Thus, the only information the Final EIS reveals concerning the wilderness attributes of each area is a single number. Instead of identifying the unique wilderness attributes of each area, it treats wilderness characteristics as essentially fungible, and lumps them together for competitive ranking against other areas which may or may not be similar.
 
 
 40
 Second, the CEQ Guidelines require "agencies to assess the positive and negative effects of the proposed action as it affects both the national and international environment," id. at § 1500.8(a)(3)(i), 38 Fed.Reg. at 20,553, and to discuss "(a)ny irreversible and irretrievable commitments involved in the proposed action should it be implemented." Id. at § 1500.8(d)(7), 38 Fed.Reg. at 20,554. This inquiry requires an agency to assess the wilderness value of each area and to evaluate the impact of Nonwilderness designations upon each area's wilderness characteristics and value. We agree with the district court that the RARE II Final EIS is deficient in both respects. While the value of wilderness is discussed in broad terms, no attempt is made to assess the intrinsic worth of the wilderness features of any particular area, nor to forecast the value lost under various developmental regimes.
 
 
 41
 Third, the CEQ Guidelines require an EIS to discuss "(s)econdary or indirect ... consequences for the environment." Id. at § 1500.8(a)(3)(ii), 38 Fed.Reg. at 20,553, and to discuss specifically "the extent to which the action irreversibly curtails the range of potential uses of the environment," id. at § 1500.8(a)(7), 38 Fed.Reg. at 20,554. As noted by the district court, the RARE II Final EIS fails to comply with this requirement because it does not consider the effect of Nonwilderness classification upon future opportunities for wilderness classification. California v. Bergland, 483 F.Supp. at 486-87. Under Forest Service regulations, Nonwilderness areas may be reconsidered for Wilderness System inclusion in devising the second generation of forest plans ten to fifteen years hence. In the interim, however, these areas will be managed for uses other than wilderness. The foreclosing of the wilderness management option requires a careful assessment of how this new management strategy will affect each area's benchmark characteristics as identified in the Wilderness Act.
 
 
 42
 Fourth, the CEQ Guidelines require an agency to indicate "what other interests and considerations of Federal policy are thought to offset the adverse environmental effects of the proposed action." Id. at § 1500.8(a)(8), 38 Fed.Reg. at 20,554. While the EIS carefully identifies the economic benefit attributable to development in each area, no effort is made to weigh this benefit against the wilderness loss each area will suffer from development. This evaluation need not be in the form of a formal cost benefit analysis, Trout Unlimited, Inc., 509 F.2d at 1286, but it should reflect that the Forest Service has compared for each area the potential benefits of Nonwilderness management against the potential adverse environmental consequences. See 42 U.S.C. § 4332(2)(B) (1976); Calvert Cliffs' Coordinating Comm., Inc. v. United States Atomic Energy Comm'n, 449 F.2d 1109, 1113 (D.C.Cir.1971).
 
 
 43
 The Forest Service argues that most of the above-mentioned deficiencies are rectified if the worksheets prepared by the Forest Supervisors to compute the score for the WARS are considered part of the RARE II Final EIS. A typical WARS worksheet consists of approximately twelve pages of site-specific data regarding a single inventoried area. First, for the reasons given by the district court, we question whether the worksheets contain the type of site-specific analyses required by NEPA. California v. Bergland, 483 F.Supp. at 486-87. Second, in any event we conclude that the worksheets cannot be fairly considered as part of the RARE II Final EIS. It is settled in this circuit that any supporting data or studies expressly relied upon in an EIS must be "available and accessible" to the public. Trout Unlimited, Inc., 509 F.2d at 1284. The WARS worksheets, however, are scattered all over the country in various Regional Foresters' offices, dooming any practical attempt to review comprehensively the worksheets. Given this inaccessibility, the worksheets may not be considered in determining the RARE II Final EIS's adequacy. See Environmental Defense Fund, Inc. v. Froehlke, 473 F.2d 346, 350 (8th Cir. 1972); Natural Resources Defense Council v. Morton, 458 F.2d 827, 834 (D.C.Cir.1972).
 
 
 44
 We concede that conducting a detailed site-specific analysis of the RARE II decision will be no simple task and will be laden with empirical uncertainty. The scope of the undertaking here, however, was the Forest Service's choice and not the courts'. NEPA contains no exemptions for projects of national scope. Having decided to allocate simultaneously millions of acres of land to nonwilderness use, the Forest Service may not rely upon forecasting difficulties or the task's magnitude to excuse the absence of a reasonably thorough site-specific analysis of the decision's environmental consequences. See Environmental Defense Fund, Inc. v. Andrus, 596 F.2d at 851-52; Port of Astoria, Oregon v. Hodel, 595 F.2d 467, 478 (9th Cir. 1979).
 
 
 45
 II. Did the RARE II Final EIS consider a reasonable range of alternatives?
 
 
 46
 The Final EIS lists eleven alternatives, of which three-"all Wilderness", "no Wilderness" and "no action"-were included as points of reference rather than as seriously considered alternatives. RARE II Final EIS at 26. The factors considered and the methodology utilized in devising each of the remaining eight alternatives are summarized in the appendix to this opinion. Each alternative reflects a different combination of the following decisional criteria: (1) resource outputs assigned to each area by the Forest Service; (2) guidelines from the Multiple-Use Sustained-Yield Act, 16 U.S.C. § 528-531 (1976); (3) visitor accessibility; (4) landform features; (5) wildlife features; (6) ecosystems; and (7) Wilderness Attribute Rating System rating. Three of the alternatives, E, F, and G, rely exclusively upon criteria # 3 through # 6. Alternatives C, D, and I rely exclusively upon the remaining criteria. Alternative H consists of a wholly subjective evaluation of regional and local needs, and does not explicitly rely upon any of these decisional criteria. The alternative ultimately selected by the Forest Service, the Proposed Action, utilizes elements of all the decisional criteria. See Appendix, infra.
 
 
 47
 The area allocations resulting from these various alternatives are summarized in Table # 1. None of the eight alternatives seriously considered by the Forest Service designates more than thirty-three percent of the roadless acreage to Wilderness, and none designates less than thirty-seven percent of that acreage to Nonwilderness. More than one-half of the roadless acreage is allocated to Nonwilderness in six of the eight alternatives.
 
 
 48
 -------------------------------------------------------------------------------
TABLE #1
--------
PERCENT OF ACREAGE OF RARE II AREAS IN EACH RARE II PLANNING
-------------------------------------------------------------------------------
CATEGORY.*
-------- CATEGORY
 --------
 --------
ALTERNATIVE NONWILDERNESS FURTHER PLANNING WILDERNESS
----------- ------------- ---------------- ----------
-------------------------------------------------------------------------------
C 68 18 14
D 48 38 19
E 94 1 6
F 55 36 9
G 79 1 21
H 73 11 16
I 37 30 33
Proposed
 Action 59 18 23
-------------------------------------------------------------------------------
Source: RARE II Final EIS at 37.
------
 
 
 
 *
 Alternatives A, B, and J were included in the EIS as points of reference
 and were not seriously considered. See RARE II Final EIS at 26. Alternatives
 C-I were included in the draft EIS. The Proposed Action, the alternative
 ultimateely selected by the Forest Service, first appeared in the Final EIS.
 The district court held that the RARE II Final EIS failed to consider an adequate range of alternatives. The court ruled that the EIS should have considered at least three other alternatives:
 -Expanding the number of classifications beyond the broad categories Wilderness, Nonwilderness and Future Planning. Other classifications might include limited or conditioned development, areas suitable for geographical use restrictions, and areas particularly susceptible to successfully mitigating environmental damage caused by development;
 -Increasing production on federally owned land that is currently open to development;
 -Allocating to Wilderness a share of the RARE II acreage at an intermediate percentage between 34% and 100%.
 California v. Bergland, 483 F.Supp. at 492-93.
 The Forest Service challenges the district court's ruling on three overlapping grounds: (1) California has not met its burden of proof in establishing that the three alternatives suggested by the district court are "potentially viable" alternatives at this stage of planning; (2) the district court ignored the Forest Service's use of the Further Planning category when the court criticized the Final EIS for not further refining its classifications; and (3) it would be premature to consider the three alternatives suggested by the district court, given the limited scope of the RARE II decision. The connecting theme in all three contentions is that the RARE II decision is too tentative and preliminary in character to warrant consideration of these alternatives at this planning stage.
 Our standard of review is well-established. NEPA requires a "detailed statement ... on ... alternatives to the proposed action ...." 42 U.S.C. § 4332(2)(C) (1976). Agencies are also under a mandate to "(s)tudy, develop, and describe appropriate alternatives to recommend courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." Id. at § 4332(2)(E). Judicial review of the range of alternatives considered by an agency is governed by a "rule of reason" that requires an agency to set forth only those alternatives necessary to permit a "reasoned choice." Save Lake Washington v. Frank, 641 F.2d 1330, 1334 (9th Cir. 1981); Life of the Land v. Brinegar, 485 F.2d 460, 472 (9th Cir. 1973), cert. denied, 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). An EIS, however, need not consider an alternative "whose effect cannot be reasonably ascertained, and whose implementation is deemed remote and speculative." Id. As with the standard employed to evaluate the detail that NEPA requires in discussing a decision's environmental consequences, the touchstone for our inquiry is whether an EIS's selection and discussion of alternatives fosters informed decision-making and informed public participation. Save Lake Washington, 641 F.2d at 1334.
 Following these standards, we conclude that the Forest Service was reasonable in not considering the first alternative suggested by the district court. We therefore reverse the district court's ruling that the Forest Service must consider this alternative. The focal point of our inquiry must be the underlying environmental policy, and whether the agency's proposed action comports with that policy. The policy problem RARE II seeks to confront is how to allocate a scarce resource-wilderness-between the two competing and mutually exclusive demands of wilderness use and development. In that context, the RARE II decision aims to designate areas that, during the first generation of forest plans, will be managed for purposes other than wilderness preservation and will be ineligible for inclusion in the NWPS. Part I, supra.
 The first alternative suggested by the district court is not responsive to these policy concerns. The conditional use categories suggested by the district court all contemplate some type of development or nonwilderness use. The policy question which RARE II seeks to answer, however, is how much land should be opened to any type of development or nonwilderness use. Consideration of conditional use categories does not aid the agency in reaching an informed decision.
 We conclude that the second alternative is essential to making a "reasoned choice," however. We therefore affirm the district court's ruling that the Forest Service must consider this alternative. The policy at hand demands a trade-off between wilderness use and development. This trade-off, however, cannot be intelligently made without examining whether it can be softened or eliminated by increasing resource extraction and use from already developed areas. The economic value of nonwilderness use is a function of its scarcity. Benefits accrue from opening virgin land to nonwilderness use, but the benefits' worth depend upon their relative availability elsewhere, and the comparative environmental costs of focusing development in these other areas.
 The RARE II Final EIS fails to make such an inquiry. The effect is profound. All eight of the alternatives seriously considered by the Forest Service assume that at least thirty-seven percent of the RARE II areas should be developed. See Table # 1, supra. No justification is given for this fundamental premise or the trade-off it reflects. In the absence of an alternative that looks to already developed areas for future resource extraction and use, the RARE II decisional process ends its inquiry at the beginning. Although the RARE II Final EIS poses the question whether development should occur at all, it uncritically assumes that a substantial portion of the RARE II areas should be developed and considers only those alternatives with that end result.
 As for the third alternative, we also agree with and affirm the district court's ruling that NEPA requires the Forest Service to consider an alternative that allocates more than a third of the RARE II acreage to Wilderness. Whether the RARE II decision is viewed as a decision to develop or merely as the first step in a protracted planning process, it is puzzling why the Forest Service did not seriously consider an alternative that allocated more than a third of the RARE II acreage to Wilderness. All of the RARE II acreage, by definition, met the minimum criteria for inclusion in the NWPS. Nonetheless, without any explanation the Final EIS seriously considered only those alternatives that allocate more acreage to Nonwilderness than to Wilderness. Moreover, with the sole exception of Alternative I, Nonwilderness acreage allocations exceed Wilderness allocations by a substantial margin, ranging from five-to-two for Alternative D, to nineteen-to-one for Alternative E. See Table # 1, supra. While nothing in NEPA prohibits the Forest Service from ultimately implementing a proposal that allocates more acreage to Nonwilderness than to Wilderness, it is troubling that the Forest Service saw fit to consider from the outset only those alternatives leading to that end result.
 In response, the Forest Service urges that we should not focus upon the final acreage allocations resulting from each alternative, but upon the diversity of decisional criteria utilized in formulating the alternatives. The agency contends that it is the different mixes of decisional criteria, rather than the ultimate acreage allocations, which matters for NEPA review of alternatives.
 We disagree. First, as noted by the district court, nothing intrinsic in the decisional criteria requires not considering an alternative that allocates more than thirty-three percent of the RARE II lands to Wilderness. California v. Bergland, 483 F.Supp. at 490-93. Instead, what appears to have been instrumental in skewing the alternatives away from Wilderness were the numerical values assigned to the decisional criteria in each of the alternatives.
 Second, little explanation is given to justify the numerical values given these variables. The Final EIS, for instance, offers no explanation of how resource output levels were assigned to each area. The EIS states that the levels "may appear to have been arbitrarily selected but, in fact, represent a realistic establishment of acceptable resource trade-offs to provide various alternative approaches." RARE II Final EIS at 21. The Final EIS, however, does not explain what the tradeoffs were or why they were considered acceptable or realistic. California v. Bergland, 483 F.Supp. at 490. Rather than utilizing the Final EIS as an instrument for airing the issue of resource demand, the Forest Service instead shrouded the issue from public scrutiny behind the claim of administrative expertise.
 The Final EIS's consideration of wilderness attributes appears similarly arbitrary. Five alternatives, including the Proposed Action, utilize a predetermined WARS score percentile cut-off to determine area allocation. Compare Alternative C (target group designated Nonwilderness unless WARS score in top 10 percentile for region, then designated Further Planning); Alternative D (initial target group includes all areas with WARS score in top 40 percentile); Alternative F (areas with a WARS score in top 30 percentile allocated to Further Planning if not otherwise allocated to Wilderness); Alternative I (initial target group includes all areas with WARS score in top 50 percentile); and Proposed Action (Step # 5 adjustment allocates areas in Further Planning category with a WARS score in top 30 percentile to Wilderness category; areas in Nonwilderness category with a WARS score in top 5 percentile allocated to Further Planning category). See Appendix, infra.
 The required cut-off score fluctuates substantially between alternatives. Yet, the Final EIS does not explain how the cut-offs were initially assigned or why they change radically between alternatives. Although NEPA does not require the Forest Service to select any particular cut-off, we conclude that the Forest Service's statutory responsibility to explain its decision requires it to justify the cut-offs it considered.
 Third, as the district court noted, the Forest Service's argument is defective in emphasizing decisional inputs and criteria over the actual results generated by those inputs and criteria. California v. Bergland, 483 F.Supp. at 492. Although it is worthwhile to consider a broad range of variables in constructing policy alternatives, the procedure becomes meaningless if the variables are assigned numerical values such that only a limited range of outcomes result. This occurred here. In the absence of any reasonable explanation justifying the assignment of numerical values to the decisional criteria that the Forest Service selected, we conclude it was unreasonable for the Forest Service to overlook the obvious alternative of allocating more than a third of the RARE II acreage to a Wilderness designation.
 III. Did the Forest Service provide sufficient opportunity for public comment on RARE II and respond adequately to the comments?
 
 
 A
 Was NEPA violated by not soliciting further public comment on the Proposed Action?
 The district court held that the Forest Service violated NEPA by not circulating for public comment a supplemental draft EIS describing the Proposed Action. The court reasoned that: (1) 40 C.F.R. § 1500.7(a) (1977), 38 Fed.Reg. 20,550, 20,552 (1973) (superceded 1978), part of the CEQ Guidelines in effect at the time the RARE II was prepared,[6] requires an agency to provide the public an opportunity to comment on a Proposed Action "prior to the first significant point of decision in the agency review process;" (2) to effectuate this regulatory provision, an agency must circulate for public comment a supplemental draft EIS describing the Proposed Action when the Proposed Action could not have been anticipated from the alternatives considered in the draft EIS; and (3) the Proposed Action here was a radical departure from the alternatives considered in the draft EIS, requiring the circulation of a supplemental draft EIS. California v. Bergland, 483 F.Supp. at 493-96.
 We affirm. We are mindful of the Supreme Court's reminder that NEPA does not license a court "to impose upon (an) agency its own best notion of which procedures are 'best' or most likely to further some vague, undefined public good." Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, 435 U.S. 519, 549, 98 S.Ct. 1197, 1214, 55 L.Ed.2d 460 (1978). Agencies are nonetheless obliged to adhere to the procedures mandated by NEPA. Id. at 549 n.21, 98 S.Ct. at 1214 n.21. Moreover, the procedural requirements prescribed in NEPA and its implementing regulations are to be strictly interpreted "to the fullest extent possible" in accord with the policies embodied in the Act. 42 U.S.C. § 4332(1). "(G)rudging, pro forma compliance will not do." Lathan, 506 F.2d at 693.
 The Forest Service argues that no specific statutory or regulatory authority requires an agency to circulate a Proposed Action in a supplemental draft EIS for public comment. It relies principally upon one sentence in 40 C.F.R. § 1500.7(a) (1977), 38 Fed.Reg. 20,550, 20,552 (1973) (superceded 1978), which provides: "Where an agency has an established practice of declining to favor an alternative until public comments on a proposed action have been received, the draft environmental statement may indicate that two or more alternatives are under consideration." It interprets this sentence to permit an agency to postpone selection and discussion of a Proposed Action until the Final EIS is published.
 We agree with the Forest Service's underlying premise that the CEQ Guidelines then in effect are relevant to interpreting NEPA's statutory commands. While the CEQ Guidelines are advisory, the Supreme Court has declared that the Guidelines are "entitled to substantial deference" as an interpretation of NEPA. Andrus v. Sierra Club, 442 U.S. at 358, 99 S.Ct. at 2341.
 We disagree, however, with the Forest Service's assertion that 40 C.F.R. § 1500.7(a) authorizes an agency to defer revealing the Proposed Action until the issuance of a final EIS. Although the language the Forest Service cites clearly permits an agency not to disclose a Proposed Action in an initial draft EIS, the language itself does not expressly state that an agency may wait until the final EIS to announce the Proposed Action the agency intends to adopt. Instead, as noted by the district court, the Guidelines suggest that, at least in some instances, an agency must submit for public comment a supplemental draft EIS describing the Proposed Action if it has not been raised or previewed in the initial draft EIS. Section § 1500.7(a) provides:
 It is important that draft environmental statements be prepared and circulated for comment and furnished to the Council as early as possible in the agency review process in order to permit agency decisionmakers and outside reviewers to give meaningful consideration to the environmental issues involved. In particular, agencies should keep in mind that such statements are to serve as the means of assessing the environmental impact of proposed agency actions, rather than as a justification for decisions already made. This means that draft statements on administrative actions should be prepared and circulated for comment prior to the first significant point of decision in the agency review process.
 
 
 [40]
 C.F.R. § 1500.7(a) (1977), 38 Fed.Reg. 20,550, 20,552 (1973) (superceded 1978)
 Literally interpreted, this guideline requires an agency to submit for public comment a description of what it proposes to do prior to the actual decision to adopt the Proposed Action. See also id. at § 1500.9(d) (1977), 38 Fed.Reg. at 20,555 ("procedures established in these guidelines are designed to encourage public participation in the impact statement process at the earliest possible time"). Given the limited public input opportunities attendant to the issuance of a final EIS, satisfying this directive requires an agency to circulate the Proposed Action, or an alternative that resembles the ultimate Proposed Action, for public comment prior to the issuance of the final EIS. This can normally be done in the initial draft EIS. If it is not and if the Proposed Action ultimately differs so dramatically from the alternatives canvassed in the draft EIS as to preclude "meaningful consideration" by the public, section 1500.7(a) still requires the submission of the Proposed Action for public comment prior to the issuance of the final EIS. If this occurs, the circulation of a supplemental draft EIS describing the Proposed Action is the only means of satisfying this requirement.[7]
 We agree with the CEQ Guidelines' interpretation of NEPA's procedural requirements. NEPA's public comment procedures are at the heart of the NEPA review process. NEPA requires responsible opposing viewpoints to be included in the final EIS. 42 U.S.C. § 4332(2)(C) (1976); Appalachian Mountain Club v. Brinegar, 394 F.Supp. 105, 121 (D.N.H.1975). This reflects the paramount Congressional desire to internalize opposing viewpoints into the decision-making process to ensure that an agency is cognizant of all the environmental trade-offs that are implicit in a decision. See Andrus v. Sierra Club, 442 U.S. at 350, 99 S.Ct. at 2337; Appalachian Mountain Club, 394 F.Supp. at 121. To effectuate this aim, NEPA requires not merely public notice, but public participation in the evaluation of the environmental consequences of a major federal action. See Trout Unlimited, Inc., 509 F.2d at 1282.
 Failure to disclose a Proposed Action before the issuance of a final EIS can defeat this aim, at least when the Proposed Action differs radically from the alternatives mentioned in a draft EIS. Only at the stage when the draft EIS is circulated can the public and outside agencies have the opportunity to analyze a proposal and submit comment. No such right exists upon issuance of a final EIS. By refusing to disclose its Proposed Action until after all opportunity for comment has passed, an agency insulates its decision-making process from public scrutiny. Such a result renders NEPA's procedures meaningless. See Appalachian Mountain Club, 394 F.Supp. at 121.
 Having concluded that NEPA and its implementing guidelines require agencies to submit a Proposed Action for public comment prior to the issuance of the final EIS, we still must decide under what circumstances an agency must circulate a supplemental draft EIS describing the Proposed Action. The district court and the parties have suggested three possible standards: (1) the district court appears to have held that a supplement must be circulated on a Proposed Action unless the alternative is "clearly articulated" in the initial draft EIS; (2) California appears to embrace the standard employed in the current CEQ regulations, 40 C.F.R. § 1502.9(c)(1)(i) (1981), and argues that a supplemental draft must be circulated when there are "substantial" changes in the alternatives canvassed in the initial draft EIS and the alternative the agency tentatively wishes to adopt; and (3) the Forest Service argues that they should not be held to any stricter standard than is applied to formal rule-making, and urge that a supplement need not be circulated if it is the "logical outgrowth" of the alternatives considered in the draft EIS. See, e.g., American Iron & Steel Inst. v. EPA, 568 F.2d 284, 293 (3d Cir. 1977); Chrysler Corp. v. Department of Transp., 515 F.2d 1053, 1061 (6th Cir. 1975). California v. Bergland, 483 F.Supp. at 494.
 We conclude that the district court's suggested standard is too extreme. The "clearly articulated" standard appears to require an agency to repeat the public comment process even when the Proposed Action is merely a slightly modified version of an alternative evaluated in the initial draft EIS. NEPA does not impose such a burden upon an agency. The main policy reason for soliciting public comment is to use public input in assessing a decision's environmental impact. 40 C.F.R. §§ 1500.2, 1500.7(a) (1977), 38 Fed.Reg. 20,550, 20,550, 20,552 (1973) (superceded 1978). To effectuate this purpose, agencies must have some flexibility to modify alternatives canvassed in the draft EIS to reflect public input. If an agency must file a supplemental draft EIS every time any modifications occur, agencies as a practical matter may become hostile to modifying the alternatives to be responsive to earlier public comment. Moreover, requiring agencies to repeat the public comment process when only minor modifications are made promises to prolong endlessly the NEPA review process. See Environmental Defense Fund, Inc. v. Hoffman, 566 F.2d 1060, 1072 n.19 (8th Cir. 1977). The "clearly articulated" standard should therefore be rejected.
 The two standards suggested by the parties appear to give agencies greater flexibility than the district court standard, but are more difficult to apply. The phrases "substantial change" and "logical outgrowth" are not self-defining, nor have the parties explained in what respects, if any, these two standards differ.
 Our choice of an appropriate standard is guided by the longstanding Ninth Circuit rule that an "impact statement should provide the public with information on the environmental impact of a proposed project as well as encourage public participation in the development of that information." Trout Unlimited, Inc., 509 F.2d at 1282. We are also guided by the command in 40 C.F.R. § 1500.7(a) (1977), 38 Fed.Reg. 20,550, 20,552 (1973) (superceded 1978), that agencies provide the public with sufficient information to permit "meaningful consideration" of an action under agency review.
 These general precepts suggest that the EIS process should serve both to alert the public of what the agency intends to do and to give the public enough information to be able to participate intelligently in the EIS process. Applied here, this general rule calls for a pragmatic judgment: (1) whether the alternative finally selected by the Forest Service was within the range of alternatives the public could have reasonably anticipated the Forest Service to be considering, and (2) whether the public's comments on the draft EIS alternatives also apply to the chosen alternative and inform the Forest Service meaningfully of the public's attitudes toward the chosen alternative.
 Applying these principles, we conclude that the Proposed Action differed sufficiently from the alternatives canvassed in the draft EIS to warrant the circulation for public comment of a draft supplement describing the Proposed Action. First, the Proposed Action's allocation between the three designated categories differed substantially from the allocation percentages generated by the alternatives considered in the draft EIS, seriously diluting the relevance of public comment on the draft EIS alternatives. Second, although the decisional criteria employed in the Proposed Action were used earlier in one or more of the alternatives contained in the draft EIS, none of the draft EIS alternatives utilized all or most of the decisional criteria found in the Proposed Action. The Proposed Action amalgamated so many different analytical techniques that the final method of allocation could not be fairly anticipated by reviewing the draft EIS alternatives. Third, public comment on the draft EIS focused on the final acreage allocations rather than the decisional criteria, lessening the importance of the similarity between the criteria used in the draft EIS alternatives and the criteria used in the Proposed Action. Thus, circulation of a draft supplement for public comment was in order.
 B. Did the Forest Service adequately respond to site-specific comments?
 The Forest Service requested public comment on the site designations listed in the draft EIS. In response, the Forest Service received 85,258 letters, 76,831 petitions, and 101,549 response forms. In response to these comments, the Forest Service tabulated the number of comments, listed the number of responses (per RARE II area) that recommended either Wilderness, Nonwilderness or Further Planning, and incorporated these lists into Step # 1 of the Proposed Action. See Appendix, infra. Comments detailing reasons for designating a particular area in a classification were forwarded to the Regional Forester as part of Step 2 of the Proposed Action. See id.
 The district court held that this procedure violated CEQ Guidelines found in 40 C.F.R. 1500.10(a) (1977), 38 Fed.Reg. 20,550, 20,555 (1973) (superceded 1978). Section 1500.10(a) provides:
 Agencies should make every effort to discover and discuss all major points of view on the environmental effects of the proposed action and its alternatives in the draft statement itself. However, where opposing professional views and responsible opinion have been overlooked in the draft statement and are brought to the agency's attention through the commenting process, the agency should review the environmental effects of the action in light of those views and should make a meaningful reference in the final statement to the existence of any responsible opposing view not adequately discussed in the draft statement, indicating the agency's response to the issues raised. All substantive comments received on the draft (or summaries thereof where response has been exceptionally voluminous) should be attached to the final statement, whether or not each such comment is thought to merit individual discussion by the agency in the text of the statement.
 (Emphasis added).
 The district court found the Final EIS violated this section in two respects: (1) the EIS did not include site-by-site summaries of the comments, and (2) the EIS did not make "meaningful reference" to the site-specific comments or respond to the issues raised in the comments. California v. Bergland, 483 F.Supp. at 496-97.
 The Forest Service argues that the section's requirements were satisfied by providing a representative sample of the comments in Appendix V of the Final EIS and by incorporating the site-specific comments into Steps # 1 and # 2 of the Proposed Action's allocation process. See Appendix, infra.
 We disagree with the Service and affirm the district court. Admittedly, an agency's obligation to respond to public comment is limited. Not every comment need be published in the final EIS. Conservation Law Found., Inc. v. Andrus, 623 F.2d 712, 717 (1st Cir. 1979). Nor must an agency set forth at full length the views with which it disagrees. Committee for Nuclear Responsibility, Inc. v. Seaborg, 463 F.2d 783, 787 (D.C.Cir.1971). Moreover, an agency is under no obligation to conduct new studies in response to issues raised in the comments, nor is it duty-bound to resolve conflicts raised by opposing viewpoints. Warm Springs Dam Task Force, 565 F.2d at 554.
 Agencies are nonetheless obliged to provide a "meaningful reference" to all responsible opposing viewpoints concerning the agency's proposed decision. 40 C.F.R. § 1510(a) (1977), 38 Fed.Reg. 20,550, 20,555 (1973) (superceded 1978); Committee for Nuclear Responsibility, Inc., 463 F.2d at 787. This standard requires the agency to identify opposing views found in the comments such that "differences in opinion are readily apparent." Warm Springs Dam Task Force, 565 F.2d at 554; Committee for Nuclear Responsibility, Inc., 463 F.2d at 787. Moreover, "(t)here must be good faith, reasoned analysis in response." Silva v. Lynn, 482 F.2d 1282, 1285 (1st Cir. 1973).
 The scope of an agency's responsibility to respond to comments is shaped by the degree that the comments bear "on the environmental effects of the proposed action." 40 C.F.R. § 1500.10(a) (1977), 38 Fed.Reg. 20,550, 20,555 (1973) (superceded 1978). We held in Part I of this opinion, supra, that the RARE II decision commits Nonwilderness designated areas to be managed for nonwilderness use during the first generation of forest plans. We also held that the scope of this decision required the Forest Service to provide a site-by-site evaluation of the environmental impact of Nonwilderness designation. Consistent with the scope of the RARE II decision and the site-specific evaluation which NEPA requires the Forest Service to conduct, we conclude that the Forest Service was obliged to identify and discuss responsible opposing viewpoints concerning individual site allocations.
 The Final EIS fails to satisfy this obligation. The district court found, and the Forest Service does not dispute, that most of the comments received by the Forest Service discussed specific areas. Many of these comments provided specific, concrete reasons why a particular area should, or should not, be designated Nonwilderness. The Final EIS fails to identify or discuss any of these supporting reasons. Instead, the Forest Service merely tabulated the number of comments and listed the number of responses recommending Wilderness, Nonwilderness or Further Planning. The Final EIS reveals nothing else concerning these comments' content.
 The inclusion in the Final EIS of a representative sample of comments does not cure this deficiency. While several of the comments discuss particular areas, "their usefulness to the decisionmaker depends upon the extent to which they are addressed and incorporated by reference in the statement." Sierra Club v. Adams, 578 F.2d 389, 395 (D.C.Cir.1978). The site-specific references in the comments are nowhere identified or discussed in the final EIS.
 C. Did the Forest Service improperly change its announced method of evaluating public comment?
 In soliciting public comment, the draft EIS offered the following instruction:
 Emphasis will be placed on the value of response content rather than on the number of signatures that support it. While the information in petitions and forms may be as useful as that contained in a personal letter, multiple signatures on petitions or multiple copies of form letters will not make them more valuable than the personal letters in decision-making.
 Forest Service, U. S. Dep't of Agriculture, RARE II Draft Environmental Impact Statement, Roadless Area Review Evaluation 107 (1978) (hereinafter cited as "RARE II Draft EIS").
 The district court held that the Forest Service violated this guideline, thereby violating NEPA. California v. Bergland, 483 F.Supp. at 497-98. The court based its conclusion on how the comments were used in reaching the Proposed Action's allocation. Under the Proposed Action's first step, area designations set in the initial allocation were altered according to the number of signatures favoring different designations. See Appendix, infra. The district court concluded that this procedure emphasized the number of signatures attached to a comment rather than content value, contrary to the procedure the Forest Service earlier promised to follow.
 The Forest Service argues that the district court mischaracterized both the procedure outlined in the draft EIS and the procedure actually followed in the Proposed Action. We agree and reverse. Although the draft EIS indicated that content value would be favored, the passage the district court relied upon does not say that the number of signatures would be totally disregarded. Moreover, the draft EIS gave fair warning that the number of signatures supporting particular designations would be considered. Two paragraphs above the passage which the district court relied upon is a warning that a "condensed analysis process" would be used. RARE II Draft EIS at 107. In addition, the draft EIS elsewhere states that "(w)hen the preponderance of public comment indicates preference for allocation of individual areas, considerable weight will be given to such allocations." Id. at 67. We therefore conclude that the district court erred in holding that the Forest Service did not follow the procedure it delineated in the RARE II Draft EIS.
 IV. Does section 1604(c) of the National Forest Management Act exempt the RARE II areas from compliance with NEPA?
 In an argument not joined in by the other appellants, Webco Lumber Company argues that the district court erred in holding that NEPA applies to decisions to implement land management plans existing prior to October 22, 1976, the effective date of the National Forest Management Act ("NFMA"), 16 U.S.C. § 1604 (1976). California v. Bergland, 483 F.Supp. at 499-501. We agree with the district court and affirm.
 NFMA provides standards and guidelines which the Forest Service must follow in developing land and resource management plans for units of the National Forest System. Section 1604 directs the Forest Service to develop and implement plans for each unit by 1985. In the interim, § 1604(c) provides: "(u)ntil such time as a unit of the National Forest System is managed under plans developed in accordance with this subchapter, the management of such unit may continue under existing land and resource management plans." Webco argues that this language validates development under any management plan extant prior to NFMA's effective date, whether or not the project was authorized in accord with NEPA. Webco in particular argues that timber harvesting in three national forests-the Klamath, Six-Rivers and Shasta-Trinity-is not subject to further NEPA review because timber management plans existed for these three national forests prior to NFMA's effective date.
 Webco's contention is ill-considered. NEPA must be complied with to "the fullest extent possible" unless there is a "clear and unavoidable conflict in statutory authority." Flint Ridge Dev. Co. v. Scenic Rivers Ass'n, 426 U.S. 776, 788, 96 S.Ct. 2430, 2438, 49 L.Ed.2d 205 (1976). No such conflict exists here because nothing in NFMA specifically prohibits compliance with NEPA. The Senate Report concerning the NFMA specifically states that NFMA "does not alter the responsibilities of the Forest Service to comply with (NEPA) or the guidelines of the Council of Environmental Quality." S.Rep. No. 94-893, 94th Cong., 2d Sess. 14, reprinted in (1976) U.S.Code Cong. & Ad.News 6662, 6673-74. The same point is repeated in the Conference Report on the NFMA. See S.Rep. No. 94-1335, 94th Cong., 2d Sess. 27, reprinted in (1976) U.S.Code Cong. & Ad.News 6721, 6729.
 The only section in NFMA that specifically mentions NEPA states that the NFMA regulations shall "specify procedures to insure that land management plans are prepared in accordance with the National Environmental Policy Act ...." 16 U.S.C. § 1604(g)(1) (1976). The Senate Report explains that this provision "is neither intended to enlarge nor diminish the Forest Service's responsibilities under the (National Environmental Policy) Act." S.Rep. No. 94-893, 94th Cong., 2d Sess. 14, reprinted in (1976) U.S.Code Cong. & Ad.News 6662, 6693.
 Section 1604(g)(1) and NFMA's legislative history clearly indicate that Congress did not intend to exempt any national forest plan from NEPA review. Section 1604(c) does authorize continued management under plans predating NFMA, but the section does not speak to whether NEPA's requirements can be disregarded. All the section appears to mean is that management plans predating NFMA are not automatically invalidated by NFMA's enactment. The legislative history which Webco cites is consonant with this limited aim.
 Webco also relies upon Texas Comm. on Natural Resources v. Bergland, 573 F.2d 201 (5th Cir.), cert. denied, 439 U.S. 966, 99 S.Ct. 455, 58 L.Ed.2d 425 (1978), to support its position. Texas Committee held that the legislative history underlying the NFMA relieved the Forest Service from preparing an EIS on the propriety of clearcutting in the Texas national forests. This holding has limited relevance here. In reaching its result, the Texas Committee court particularly emphasized that Congress had placed its own restrictive guidelines on timbering practices to be used on all national forests pending the development of permanent NFMA guidelines. Id. at 209-10. No functional equivalent of these harvest guidelines is present here. Thus, RARE II areas are not exempt from NEPA compliance.
 V. Other issues.
 A. Violation of the National Forest Management Act.
 As an alternate ground for supporting the judgment below, California argues that the RARE II Nonwilderness designations were made in violation of the NFMA. The gist of its argument is that the NFMA requires Nonwilderness designations to be made by using a site-specific local planning process rather than a national review process. The district court considered the argument, but concluded that its ruling on the NEPA cause of action eliminated the need to rule on this issue. California v. Bergland, 483 F.Supp. at 472 n.4. The district court apparently based this conclusion on the belief that its order requiring a more detailed site-specific analysis of RARE II areas overlapped any relief that could be awarded under California's NFMA claim. We agree. Because we have affirmed the district court's ruling with respect to site-specific analysis, we need not reach the NFMA cause of action.
 B. Sufficiency of the Final RARE II EIS to support Wilderness designations.
 Webco argues that if the Final RARE II EIS is legally insufficient to support the Nonwilderness designations, the same EIS cannot be held legally sufficient to support the Wilderness designations. We disagree. California's complaint below urged only that the Forest Service's Nonwilderness designations failed to follow these procedures, limiting the scope of the litigation to this single area. Moreover, NEPA's central requirement is that agencies must take a "hard look" at the environmental consequences of its proposed action. It is unclear why a more intensive review of the Wilderness designations' environmental consequences might have given the Forest Service reason to reconsider its Wilderness recommendations and allocate additional areas to Nonwilderness.
 C. State of California's standing.
 Webco argues that the State of California lacks standing because it cannot demonstrate injury from an inadequate EIS. We disagree. To demonstrate standing, a plaintiff must allege that the challenged action has caused "injury in fact" and that the interest sought to be protected is "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." City of Davis v. Coleman, 521 F.2d 661, 670 (9th Cir. 1975) (quoting Association of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 152, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970)). A governmental entity wishing to challenge an EIS satisfies these requirements if it is in geographical proximity to the Proposed Action's site, and is one of the governmental entities a federal agency must consult in the EIS process under § 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C) (1976). Id. 521 F.2d at 670-72. California satisfies the first requirement because the RARE II allocations will affect lands owned by California. The second requirement is also satisfied because the state agency that brought suit here, the California State Resources Agency, is one of the "State ... agencies ... which are authorized to develop and enforce environmental standards" that must be consulted under § 102(2)(C). 42 U.S.C. § 4332(2)(C).
 D. Webco's motion to intervene as of right.
 Webco argues that the district court erred in denying its motion to intervene as of right under Federal Rule of Civil Procedure 19(a). Webco's appeal of this order is not timely. The order denying intervention as of right was entered October 10, 1979, and was a final appealable order. See County of Fresno v. Andrus, 622 F.2d 436, 438 (9th Cir. 1980). Webco had sixty days from the entry of the order to appeal. Fed.R.App.P. 4(a). Webco did not enter its notice of appeal until March 5, 1980, three months after the expiration of the sixty day deadline.
 Webco also fails to demonstrate any specific injury arising from the denial of its motion. The district court allowed Webco to enter the litigation under permissive intervention. Although Webco now complains that this status limited its ability to present evidence, this complaint is too generalized to conclude that Webco was denied a full opportunity to present its position to the district court.
 AFFIRMED in part, REVERSED in part, and REMANDED.APPENDIX
 Summaries of the Allocation Alternatives Seriously
 Considered by the Forest Service
 ALTERNATIVE C.
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 Summary: Allocate high resource areas to Nonwilderness, with limited consideration to wilderness attributes.
 Method of Allocation:
 
 
 [1]
 Identify RARE II areas that meet one or more of the following criteria:
 a. Total potential timber yield exceeds: (1) 4 million board feet/year in the Western U. S.; or (2) 2 million board feet/year in Eastern U. S. (Note that attribute minimum is higher in Alternative D, Step 2(a)).
 b. Change in grazing capacity between wilderness and nonwilderness use exceeds 300 animal units. (Note that the attribute minimum is higher in Alternative D, Step 2(b)).
 c. Change in total recreation visitor days is greater than 10,000 between nonwilderness and wilderness use. (Note that the attribute minimum is higher in Alternative D, Step 2(c)).
 d. Area has producing mines or proven mineral reserves.
 e. Area has a high potential for "critical minerals."
 f. Area has high potential for oil, gas, geothermal, coal or uranium.
 
 
 [2]
 Designate all areas identified in Step 1 as Nonwilderness unless Wilderness Attribute Rating System ("WARS") score is in the top ten percentile of all RARE II areas in the Region
 
 
 [3]
 Allocate areas identified in Step 1 but excluded in Step 2 to the Further Planning category. Allocate all other areas to Wilderness
 ALTERNATIVE D.
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLESummary: Add roadless areas with high WARS scores to the National Wilderness Preservation System, with consideration given to potential development resources.
 Method of Allocation:
 
 
 [1]
 Identify areas with a WARS score in the top 40 percentile of a Region's RARE II areas
 
 
 [2]
 Of the areas identified in Step 1, identify areas that have one or more of the following attributes:
 (a) Total potential lumber yield exceeds: (1) 8 million board feet annually in the Western U. S.; or (2) 4 million board feet in Eastern United States. (Note that attribute minimum is lower in Alternative C, Step 1(a)).
 (b) Change in grazing capacity between wilderness and nonwilderness use exceeds 750 animal units. (Note that the attribute minimum is lower in Alternative C, Step 1(b)).
 (c) Change in total recreation visitor days exceeds 15,000 between potential nonwilderness and wilderness management. (Note that attribute minimum is lower in Alternative C, Step 1(c)).
 (d) Area has producing mines. (Note that Alternative C, Step 1(d)-(e) also includes proven mineral reserves and "critical" minerals potential).
 (e) Area has a high potential for oil, gas, geothermal, coal or uranium.
 
 
 [3]
 Allocate all areas identified in Step 2 to the Further Planning category. Allocate all other areas identified in Step 1 to the Wilderness category. Allocate all other areas to the Nonwilderness category
 ALTERNATIVES E, F and G.
 Summary: Allocate areas to Wilderness that meet predetermined minimum levels of visitor accessibility, wildlife, ecosystem, and landform characteristics.
 Method of Allocation:
 
 
 [1]
 Alternatives E, F and G are alternative collections of RARE II areas that provide representative samples of each of the listed characteristics. Of the three, Alternative G would allocate the largest number of areas to Wilderness; Alternative E would allocate the least number of areas to Wilderness. The collections are summarized in Table I
 -----------------------------------------------------------------------------
TABLE I DESCRIPTION OF CRITERIA FOR WILDERNESS DESIGNATION FOR
 -----------------------------------------------------------
 ALTERNATIVES E, F AND G.
 --------------------------------------
 Alternative
 -----------
 -----------
Characteristic Alternative E Alternative F Alternative G
-------------- ------------- ------------- -------------
--------------
Landform One One Three
 Representation Representation Representations
 of each of each of of
 40 different 40 different 40 different
 types of types of types of
 landform landform landform
Ecosystem Two Representations Three to Five Six Representations
 of each Representations of
 of 241 types of each of 241 each of 241
 of ecosystems types of types of
 ecosystems ecosystems
Wildlife Each of 22 Each of 22 Each of 22
 widely widely widely
 distributed distributed distributed
 species in at species in at species in at
 least 25 units least 50 units least 50
 of the NWPS of the NWPS units of the
 NWPS
Accessibility Allocate areas Allocate areas Allocate
(of the counties to wilderness to wilderness areas to
with below such that "A" such that "A" wilderness
median counties have counties have such that "A"
accessibility to 2 more wilderness 4 more wilderness counties have
national areas areas within 6 more
wilderness within 250 250 miles, wilderness
areas, divide miles and"B" "B"counties areas within
counties into counties have have 3 more 250 miles,
categories A, 1 more wilderness wilderness "B" counties
B and C, with area areas within have 5 more
category A within 250 250 miles, and wilderness
having the worst miles. "C" counties areas within
accessibility have 2 more 250 miles, &
and category C wilderness "C"counties
having the areas within have 4 more
best) 250 miles. wilderness
 areas within
 250 miles.
-------------------------------------
Source: RARE II Final EIS at 27-30.
-----------------------------------------------------------------------------
 
 
 [2]
 Allocation rules: Allocate as Wilderness all the areas in the collections in Table I. For Alternatives E and G, allocate all other RARE II areas to Nonwilderness. For Alternative F, allocate an area not in Table I to Further Planning if the area has a WARS score in the top 30 percentile for the region; otherwise allocate the area to Nonwilderness
 ALTERNATIVE H.
 Summary: Allocate areas in accord with a subjective assessment of regional and local needs.
 Factors considered:
 (1) Regional commodity and recreation tradeoffs.
 (2) Local social and economic effects.
 (3) Concerns of special interest groups.
 (4) State and local government positions.
 (5) Industrial needs for natural resources.
 (6) Prospective resource management programs.ALTERNATIVE I.
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 Summary: Allocates areas to Wilderness that have the highest WARS score, with consideration to resource attributes.
 Method of Allocation:
 
 
 [1]
 Identify areas with a WARS score in the top 50 percentile of a Region's RARE II areas
 
 
 [2]
 Of the areas identified in Step 1, identify the areas that have one or more of the following attributes:
 (a) Proven minerals or producing mines.
 (b) Proven reserves of oil, gas, geothermal, coal or uranium.
 (c) Potential timber yield in the top 5 percentile of roadless areas within the Region.
 (d) Potential grazing use in the top 5 percentile of animal unit months for the Region.
 
 
 [3]
 Allocate all areas identified in Step 2 to the Further Planning Category. Allocate all other areas identified in Step 1 to the Wilderness category. Allocate all other areas to the Nonwilderness category
 PROPOSED ACTION
 Summary: Using congruence between Alternatives C and I as an analytical base, allocates areas using decisional criteria found in various alternatives.
 Method of Allocation:
 
 
 [1]
 Allocate to Wilderness all areas that both Alternatives C and I allocate to Wilderness. Allocate to Nonwilderness all areas that both Alternatives C and I allocate to Nonwilderness. Allocate all remaining areas to Further Planning
 
 
 [2]
 Using the allocations described in # 1 as an analytical base, modify the allocations according to the following steps:
 Step # 1: Prepare two sets of allocations. The first set, the "strong site specific list," is created by changing the classification category for an area if 85% or more of the signatures on public comments with respect to an area favor a reclassification. The second set, the "moderate site specific list," is created by changing the classification for an area if 71% or more of the signatures on public comments with respect to an area favor reclassification.
 Step # 2: The Regional Forester adjusts the lists devised in Step # 1 if he or she believes the reclassification is not in accord with public opinion.
 Step # 3: Add areas to Wilderness such that the minimum wildlife, ecosystem and landform characteristics of Alternative E are attained. Add areas to Wilderness such that the minimum visitor accessibility characteristic of Alternative F is attained.
 Step # 4: National Grassland roadless areas not selected as Wilderness in Step # 3 are allocated to Further Planning unless previously evaluated under the land management process. If so evaluated, the area is allocated to Nonwilderness.
 Step # 5: Adjust both lists such that: (1) areas in the Further Planning category with WARS ratings in the top 30 percentile are moved to the Wilderness category, and (2) areas in the Nonwilderness category with WARS ratings in the top 5 percentile are moved to the Further Planning category.
 Step # 6: Adjust both lists such that: (1) areas in the Wilderness category with high resource potential are moved to the Further Planning or Nonwilderness category, and (2) areas in the Further Planning category that would cause significant employment or commodity effects if designated Wilderness are moved to the Nonwilderness category, and (3) areas in the Wilderness category that would prompt significant commodity or employment effects if designated Wilderness are moved to the Nonwilderness category.
 Step # 7: Modifications made in both lists to assure adherence with 1975 RPA program goals.
 Step # 8: Modifications made in both lists by Regional Forester using "professional judgment."
 Step # 9: Both lists are compared with the allocations resulting from Alternatives C through I. Further modifications made.
 Step # 10: Two lists evaluated for conformity with competing national goals.
 
 
 *
 John R. Block has been substituted for Bob Bergland as defendant-appellant in this appeal pursuant to Federal Rule of Appellate Procedure 43(c)(1)
 
 
 **
 Honorable Richard B. Kellam, Senior United States District Judge for the Eastern District of Virginia, sitting by designation
 
 
 [1]
 The Wilderness Act defines "wilderness" as follows:
 A wilderness, in contrast with those areas where man and his own works dominate the landscape, is hereby recognized as an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain. An area of wilderness is further defined to mean in this Act an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions and which (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value.
 16 U.S.C. § 1131(c) (1976).
 
 
 [2]
 Since 1964, Congress has added numerous areas administered by the various federal land management agencies to the Wilderness System. As of November 1, 1978, this system consisted of 187 areas totaling more than 19 million acres. The Forest Service administers 110 of these areas, totaling more than 15.2 million acres
 To date, Congress has designated less than ten percent of the lands administered by the Forest Service as components of the Wilderness System. The Forest Service administers the remaining lands under other statutes. Among these is the Organic Administration Act, 30 Stat. 34, 16 U.S.C. § 475 (1976), which provides, in part, that the purposes of the National Forests are "to improve and protect the forest ... or for the purpose of securing favorable conditions of water flows, and to furnish a continuous supply of timber ...." The Organic Act was supplemented by the Multiple-Use and Sustained-Yield Act of 1960 (MUSY), 74 Stat. 215, 16 U.S.C. § 528 (1976), which declares that: "the national forests are established and shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes." "Multiple use" is defined in part as: "the management of all of the various renewable surface resources of the national forest so that they are utilized in the combination that will best meet the needs of the American people ...." 16 U.S.C. § 531(a) (1976).
 Another relevant statute is the Forest and Rangeland Renewable Resources Planning Act of 1974 (RPA), 88 Stat. 476, 16 U.S.C. § 1600 (1976). As originally enacted, the RPA required the Secretary of Agriculture to develop national planning documents known as the "Renewable Resource Assessment" and the "Renewable Resource Program". Sections 2, 3, 16 U.S.C. §§ 1601, 1602 (1976). Generally speaking, the "Assessment" consists of an analysis of national uses and demands of renewable resources, together with an inventory and discussion of general policy considerations. The "Program" generally consists of specific estimates of national inputs and outputs concerning renewable resources. The "Program" includes "land and resource management plans for units of the National Forest System ...." Section 5, 16 U.S.C. § 1604 (1976). The Assessment must be updated every 10 years and the Program must be updated every 5 years. Finally, in Section 10, 16 U.S.C. § 1609 (1976), Congress declared that the National Forest System consists of units "united into a nationally significant system dedicated to the long-term benefit for present and future generations" ... and that all units are included "into one integral system."
 In 1976, the RPA was amended comprehensively by the National Forest Management Act (NFMA), 90 Stat. 2949. The NFMA amended the original Section 5, 16 U.S.C. § 1604, by directing the Secretary to publish regulations, "under the principles of the Multiple-Use Sustained-Yield Act of 1960," governing the development of land management plans for units of the National Forest System. The Secretary was directed to incorporate the standards and guidelines established by NFMA and the regulations into unit land management plans as soon as practicable and that he "shall attempt to complete such incorporation for all such units by no later than September 30, 1985." The statute requires that the unit land management plans must be prepared in accordance with the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4331-4334 (1976). The Forest Service published final regulations governing preparation of the unit land management plans on September 17, 1979. See 44 Fed.Reg. 53,928 (1979) (codified at 36 C.F.R. Part 219 (1981)).
 
 
 [3]
 Section 4332 provides:
 The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this Act, and (2) all agencies of the Federal Government shall-
 (A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;
 (B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by title II of this Act, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;
 (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on-
 (i) the environmental impact of the proposed action,
 (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
 (iii) alternatives to the proposed action,
 (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
 (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.
 Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of title 5, United States Code, and shall accompany the proposal through the existing agency review processes;
 (D) any detailed statement required under subparagraph (C) after January 1, 1970, for any major Federal action funded under a program of grants to States shall not be deemed to be legally insufficient solely by reason of having been prepared by a State agency or official, if:
 (i) the State agency or official has statewide jurisdiction and has the responsibility for such action,
 (ii) the responsible Federal official furnishes guidance and participates in such preparation,
 (iii) the responsible Federal official independently evaluates such statement prior to its approval and adoption, and
 (iv) after January 1, 1976, the responsible Federal official provides early notification to, and solicits the views of, any other State or any Federal land management entity and, if there is any disagreement on such impacts, prepares a written assessment of such impacts and views for incorporation into such detailed statement.
 The procedures in this subparagraph shall not relieve the Federal official of his responsibilities for the scope, objectivity, and content of the entire statement or of any other responsibility under this Act; and further, this subparagraph does not affect the legal sufficiency of statements prepared by State agencies with less than statewide jurisdiction.
 (E) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;
 (F) recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;
 (G) make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;
 (H) initiate and utilize ecological information in the planning and development of resource-oriented projects; and
 (I) assist the Council on Environmental Quality established by title II of this Act.
 42 U.S.C. § 4332 (1976).
 
 
 [4]
 In laying out the general principles that will govern forest management, 36 C.F.R. § 219.1(b) (1981) commands that:
 All levels of planning will be based on the following principles:
 (1) That the National Forests are ecosystems and their management for goods and services requires an awareness of the interrelationships among plants, animals, soil, water, air, and other environmental factors within such ecosystems. Proposed management will consider these interrelationships.
 (5) Preservation of important historic, cultural and natural aspects of our national heritage.
 (Emphasis added).
 Moreover, the design of regional and forest plans must conform with the management standards and guidelines provided in 36 C.F.R. § 219.13 (1981). These standards require, among other things, that "all management practices" will assure the protection of soil, watershed, fish, wildlife and aesthetic values, id. at § 219.13(b)(6) & (7) (emphasis added), and include measures for preventing the adverse modification of critical habitat for threatened and endangered species, id. at § 219.13(b)(9). Additionally, management policies affecting tree cover must include an assessment of the policies' effect on the general environment, aesthetic values, water quality, wildlife and fish habitat, and regeneration of tree species. See id. at § 219.13(c)(1) & (6).
 
 
 [5]
 The 1973 CEQ Guidelines were supplanted by the CEQ Regulations adopted November 29, 1978, 43 Fed.Reg. 55,990 (1978) (now codified at 40 C.F.R. §§ 1500-1508 (1981)). The new regulations do not apply to an environmental impact statement if a draft statement had been filed prior to July 30, 1979. 40 C.F.R. § 1506.12(a) (1981). As the draft statement here had been filed before this date, the 1973 CEQ Guidelines apply
 
 
 [6]
 See note 5 supra
 
 
 [7]
 The Forest Service also cites 40 C.F.R. § 1500.2(b) (1977) as authority for not selecting or disclosing the Proposed Action until the publication of the final EIS. It emphasizes the following language:
 In this process (of assessing environmental impacts), Federal agencies shall: (1) Provide for circulation of draft environmental statements to other Federal, State, and local agencies and for their availability to the public in accordance with provisions of these guidelines; (2) consider the comments of the agencies and the public; and (3) issue final environmental impact statements responsive to the comments received.
 
 
 [40]
 C.F.R. § 1500.2(b) (1977), 38 Fed.Reg. 20,550, 20,550 (1973) (superceded 1978)
 The Forest Service argues that these are the only requirements the Forest Service was obliged to observe and that these general requirements were satisfied here. It overlooks, however, the modifying clause in subsection (1) that prescribes that draft EIS circulation must be "in accordance with provisions of these guidelines." This clause means that the specific directives of the regulatory sections immediately following section 1500.2 govern the application of the section's general requirements. Thus, if the district court's interpretation of section 1500.7(a) is correct, section 1500.2 does not counter the subsequent guideline's effect.