961 F.2d 886
 22 Envtl. L. Rep. 21,287
 NORTHERN ALASKA ENVIRONMENTAL CENTER; Sierra Club, Inc.;
Denali Citizens Council, Plaintiffs-Appellants,
v.
Manuel LUJAN, Jr., et al., Defendants-Appellees,
and
Alaska Miners Association, Inc., Defendant-Intervenor-Appellee,
and
Joseph E. Vogler; Resource Development Council for Alaska,
Inc., Defendants-Intervenors.
 No. 91-35296.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 5, 1992.
Decided April 14, 1992.
 
 Robert B. Briggs, Marilyn J. Twitchell, Sierra Club Legal Defense Fund, Inc., Juneau, Alaska, for plaintiffs-appellants.
 Barry M. Hartman, Acting Asst. Atty. Gen., Dean K. Dunsmore, Dirk D. Snel, Martin W. Matzen, U.S. Dept. of Justice, Washington D.C., Dennis Hopewell, Deputy Regional Sol., Dept. of Interior, Anchorage, Alaska, for defendants-appellees.
 Ronald A. Zumbrun, Robin L. Rivett, Pacific Legal Foundation, Sacramento, Cal., James S. Burling, Pacific Legal Foundation, Anchorage, Alaska, for defendants-intervenors-appellees.
 Appeal from the United States District Court for the District of Alaska.
 Before: WRIGHT and ALARCON, Circuit Judges, and DAVIES*, District Judge.
 ALARCON, Circuit Judge:
 
 
 1
 Northern Alaska Environmental Center, Denali Citizens Council, and the Sierra Club, Alaska Chapter (collectively, the "Sierra Club") appeal from the order that dissolved the injunction issued by the district court in 1988. The federal defendants (collectively, the "Park Service") were ordered in 1988 to prepare environmental impact statements ("EISs") that studied the cumulative environmental effects of mining before approving any further mining in three national parks in Alaska. The Sierra Club alleges that the EISs prepared in response to the injunction do not comply with the National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq. ("NEPA"). We affirm because we conclude that the district court did not abuse its discretion in ruling that the EISs concerning the impact of any possible future mining activity in the parks are adequate under the rule of reason because a further study of the effect on the environment will occur prior to the granting of any mining permit.
 
 I.
 
 2
 In 1985 the Sierra Club filed suit seeking an injunction to halt the issuance of mining permits without an environmental impact study. The Sierra Club alleged that the Park Service was issuing temporary permits that authorized mining operations and access to persons who had acquired patented and unpatented mining claims in Denali National Park and Preserve ("Denali"), Wrangell-St. Elias National Park and Preserve ("Wrangell"), and Yukon-Charley Rivers National Preserve ("Yukon") without complying with the requirements of NEPA and the National Park Service regulations implementing the Mining in the Parks Act, 16 U.S.C. §§ 1901-12.
 
 
 3
 On July 24, 1985, the district court issued a preliminary injunction barring the Park Service from approving mining operations until an EIS was prepared for each park that evaluated the cumulative effect of further mining operations. The court held that the Park Service had violated NEPA since 1979 by issuing temporary approvals of mining operations without conducting EISs or environmental assessments ("EAs"). It concluded that there were "substantial questions" regarding whether further mining operations in the national parks would have significant cumulative environmental effects.
 
 
 4
 Intervenor-defendants Alaska Miners Association and the Resource Development Council for Alaska appealed, challenging the validity of the preliminary injunction. Northern Alaska Environmental Center v. Hodel, 803 F.2d 466 (9th Cir.1986). We affirmed after the Park Service conceded that it had violated NEPA and represented that it would comply with the district court's injunction. Id. at 469.
 
 
 5
 The district court issued a permanent injunction in this matter on March 7, 1988. It enjoined the Park Service "from approving or permitting any further mining operations [in the three parks] until adequate environmental impact statements [were] prepared that study the cumulative environmental effects of mining in those parks." The district court also ordered that
 
 
 6
 [p]rior to completion of the respective environmental impact statements, the federal defendants or any party to this action may upon a showing that a mining operation in fact does not contribute to any cumulative environmental impact on a park move to modify this injunction to exclude that operation from the injunction. Alternatively, a mine operator not already a party to this action may move for limited intervention and similarly request relief from this injunction.
 
 
 7
 The court retained jurisdiction "to enforce, modify or dissolve the ... injunctions contained in th[e] final judgment."
 
 
 8
 In May 1990, the Park Service made public an EIS for each park. Each EIS presented four alternatives for evaluating and dealing with the cumulative environmental effects of any future mining operations. For purposes of analysis, each EIS developed a hypothetical "mining development scenario" predicting the most probable number and type of mines likely to operate over the next ten years for each park. The cumulative environmental impact of managing this level of mining under each alternative was then evaluated in the EISs.
 
 
 9
 Under Alternative A, the Park Service proposed that it would study each application on a case-by-case basis pursuant to the requirements of NEPA. In the Alternative A studies, an assessment of site-specific and cumulative impacts would be made qualitatively using specific field information pertinent to each proposed mining operation. The Park Service committed itself to comply with all relevant regulations, including 36 C.F.R. Subpart 9A, 9.10, and 9.11, 43 C.F.R. Part 36, NEPA, Section 810 of the Alaska National Interest Lands Conservation Act of 1980, and other applicable state and federal requirements in deciding whether to approve applications for mining operations. If the impact of a proposed operation could not be sufficiently mitigated, the plan would not be approved.
 
 
 10
 Alternative B was identical to Alternative A except that the Park Service proposed that, where possible, it would review cumulative impacts on a quantitative basis. The Park Service set resource protection goals ("RPGs") which estimated the percentage of pre-mining habitat that the Park Service would try to maintain or reestablish. RPGs for the specific types of habitats threatened in each park were set at 90% or 95% of the pre-existing habitat. If cumulative impacts from a proposed mining operation reduced a specified habitat below its RPG, the Park Service would count that as a factor militating against approval of the proposed plan. The Park Service concluded that the use of RPGs would reduce environmental harm from mining more than the purely qualitative analysis in Alternative A.
 
 
 11
 In Alternative C, the Park Service proposed that, where possible, it would consider the cumulative impact of mining operations both quantitatively and qualitatively for each specific permit for mining operations. Alternative C also provided that the Park Service would seek a change in the law whereby future patents of existing mining claims would convey the minerals only and would be subject to stricter requirements for the reclamation or restoration of the environment to its original state. In addition, the Park Service would initiate a mining claim acquisition program to acquire patented and unpatented mining claims whose development would be detrimental to park values. The Park Service assumed that the additional measures set forth in Alternative C would reduce the cumulative environmental impact from mining more than under Alternative B.
 
 
 12
 The Park Service recommended in Alternative D that it purchase all existing patented and unpatented mining claims as funds become available. Mining claims that threaten the environment in the three parks would receive priority for acquisition. The Park Service also recommended that pending the acquisition of all mining claims, it would process applications for permits to conduct mining operations according to the procedures specified under Alternative C.
 
 
 13
 On August 21, 1990, the Park Service issued a "record of decision" for each park. In each record of decision, the Park Service adopted Alternative D. The Park Service reasoned that Alternative D had "the least potential to cause damage to the biological and physical environment, and would provide the highest level of protection." The Park Service represented that when a specific mining plan is submitted for approval, it will consider site-specific mitigation measures and the cumulative impacts of the operation. The cumulative impact of each previously issued mining permit would be considered in evaluating a new application to determine whether approval would exceed the desired level of cumulative impact.
 
 
 14
 The Park Service filed a motion to dissolve the permanent injunction on September 10, 1990. It argued that each EIS adequately studied the cumulative environmental effects of any future mining operation in the three parks on a hypothetical basis. The Sierra Club opposed the motion. It contended that the EISs did not satisfy the requirements of NEPA. The Sierra Club alleged, in part, that: (1) the EISs failed adequately to analyze measures to mitigate the effects of mining; (2) the EISs failed to assess the impact of non-mining activities outside the areas targeted for study in the EISs; and (3) the EISs failed to assess the impact of simultaneous mining in multiple "study areas" on migratory mammals that traverse across two or more study areas.
 
 
 15
 The district court ruled that the EISs' study of the environmental impact of hypothetical future mining operations "[was] adequate [under NEPA] in addressing cumulative impacts of mining in the parks as required by the court's Order filed March 7, 1988." It granted the Park Service's motion. The court rejected the Sierra Club's contention that the EISs should have assessed the synergistic effects of mining and non-mining activities in the parks. It stated that the injunction did not require that the EISs assess the cumulative impacts of non-mining activities. The court also rejected the Sierra Club's contention that the EISs were inadequate because they did not aggregate the cumulative impacts of mining in different study areas in the parks. It explained that "the EISs in the present case are not geared to a site-specific mining operation. At the time a specific mining plan is submitted to the [Park Service], further regulatory and statutory procedures will follow prior to the issuance of a mining permit which will include a further consideration of the cumulative impacts." The court also observed that "[e]ach EIS ... notes that mitigation measures will be more fully determined on an operation by operation basis.... At this stage, the court finds the mitigation discussion is adequate for the purposes of the present EIS[s]."
 
 II.
 
 16
 The Sierra Club contends that the district court erred in dissolving the injunction because the EISs prepared by the Park Service did not comply with NEPA. Federal Rule of Civil Procedure 60(b)(5) provides that "the court may relieve a party ... from a final judgment, order or proceeding ... [if] the judgment has been satisfied, released or discharged, or ... it is no longer equitable that the judgment should have prospective application." We review the validity of a district court's order granting dissolution of an injunction for an abuse of discretion. See Redfield v. Insurance Co. of N. Am., 940 F.2d 542, 544 (9th Cir.1991) (district court's grant of a Rule 60(b)(5) motion reviewed for abuse of discretion); Money Store, Inc. v. Harriscorp Finance, Inc., 885 F.2d 369, 372 (7th Cir.1989) (noting that the inherent power of a court of equity to modify a decree has been codified in Federal Rule of Civil Procedure 60(b)(5)); Elgin Nat'l Watch Co. v. Barrett, 213 F.2d 776, 778-79, 780 (5th Cir.1954) (district court has inherent power to dissolve permanent injunction and statutory power under Federal Rule of Civil Procedure 60(b)(5) to grant relief from an injunction when it is no longer equitable; dissolution will be reviewed only for abuse of discretion).
 
 
 17
 A district court abuses its discretion if it dissolves an injunction because of an erroneous interpretation of the law. See Hunt v. National Broadcasting Co., Inc., 872 F.2d 289, 292 (9th Cir.1989) (court abuses its discretion if it does not apply the correct legal standard or if it misapprehends the underlying substantive law). We review alleged errors in the interpretation of the law de novo. United States v. McConney, 728 F.2d 1195, 1201 (9th Cir.) (en banc), cert. denied, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).
 
 
 18
 "[W]hether a particular deficiency, or combination of deficiencies, in an EIS is sufficient to warrant holding it legally inadequate, or constitutes merely a 'fly-speck,' is essentially a legal question, reviewable de novo." Oregon Environmental Council v. Kunzman, 817 F.2d 484, 493 (9th Cir.1987) (citation omitted). In reviewing the adequacy of an EIS, we must apply a "rule of reason." California v. Block, 690 F.2d 753, 761 (9th Cir.1982). We are required to make "a pragmatic judgment whether the EIS's form, content and preparation foster both informed decision-making and informed public participation" and determine "whether an EIS contains a 'reasonably thorough discussion of the significant aspects of the probable environmental consequences.' " Id. (quoting Trout Unlimited v. Morton, 509 F.2d 1276, 1283 (9th Cir.1974)).
 
 III.
 
 19
 The Sierra Club contends that the Park Service's decision to continue to consider applications for mining operations until all the claims are acquired is tantamount to approval of at least some mining operations. The Sierra Club appears to invoke the principle announced in California v. Block, 690 F.2d 753 (9th Cir.1982), that site-specific impacts should be evaluated at the time the agency makes an "irreversible and irretrievable commitment of the availability of resources" to a project at a particular site. Id. at 761 (quoting Sierra Club v. Hathaway, 579 F.2d 1162, 1168 (9th Cir.1978)).
 
 
 20
 In support of its contention that Alternative D authorizes mining operations, the Sierra Club points to that portion of the EISs that states
 
 
 21
 [a]bsent the acquisition of mining interests, some environmental impacts to park resources will result from mining activities in the unit. The mining regulations are designed to reasonably regulate, rather than prohibit, mining operations. In the interim, until funds for acquisition are available, all plans of operations approvable under 36 CFR Subpart 9A will be approved.
 
 
 22
 The EISs, however, also state that "[i]f, however, the National Park Service determines that the impacts of proposed mining operations would violate the decision standards for plan of operations approval, 36 CFR 9.10, and the effects could not be sufficiently mitigated, the plan would be disapproved pursuant to the existing regulatory standards." Alternative D clearly requires that appropriate environmental standards must be met before any mining will be allowed. Any application for a permit to conduct mining operations that cannot meet these standards will not be approved. Accordingly, this challenge to the dissolution of the injunction is without merit.
 
 IV.
 
 23
 The Sierra Club also contends that the EISs are inadequate because they fail to analyze mitigation measures adequately, to study the impact of activities outside the study areas that could magnify the impact of mining, or to assess the impact on migratory mammals of simultaneous mining in multiple areas. We conclude that the EISs analyze the cumulative environmental impacts of the hypothetical mining scenario in sufficient detail to foster "informed decision-making." California v. Block, 690 F.2d at 761.
 
 
 24
 Each EIS devotes several hundred pages to an evaluation of the impact of any future mining operations on at least a dozen major resources, including riparian wildlife habitat and caribou, grizzly bear, wolf, Dall sheep, and moose habitat. The EISs analyze effects such as vehicle noise, the extent of acres of vegetative disturbance, erosion, and the construction of roads. The discussion of the cumulative impacts of mining operations is adequate for the purpose of evaluating the four possible alternatives for dealing with the environmental impact if any future mining is allowed to occur in the three parks.
 
 
 25
 In California v. Block, we were also confronted with the contention that a federal agency had failed to conduct an adequate study of all the issues that should be considered under NEPA in evaluating the first stage of a federal project. That project required additional studies before any further action would be taken that had an impact on the environment. Id. at 756, 762. In Block we held that in considering the adequacy of a largely programmatic EIS for a large scale, multi-step project, detailed analysis should be deferred until a "concrete development proposal crystallizes the dimensions of a project's probable environmental consequences." Id. at 761. We announced that when a programmatic EIS is prepared, "site-specific impacts need not be fully evaluated until a 'critical decision' has been made to act on site development." Id. (quoting Sierra Club v. Hathaway, 579 F.2d 1162, 1168 (9th Cir.1978)). Similarly, in Conner v. Burford, 848 F.2d 1441 (9th Cir.1988), cert. denied, 489 U.S. 1012, 109 S.Ct. 1121, 103 L.Ed.2d 184 (1989) we held that an EIS for the sale of "no surface occupancy" leases was not required because the government retained the authority to decide whether any activity would ultimately occur and could examine the effects of any proposed activity at a later stage. Id. at 1447.
 
 
 26
 In the instant matter, the Park Service has not authorized or recommended approval of any mining operations. No "critical decision" has been made to approve any mining operation application for any site in the three parks. As discussed above, Alternative D requires the Park Service to deny a future application for a permit to conduct a mining operation in the parks if it would harm the environment in violation of existing state and federal regulatory requirements. Thus, the detailed analysis of mitigation measures and cumulative and synergistic effects demanded by the Sierra Club is unwarranted at this stage. See California v. Block, 690 F.2d at 761.
 
 
 27
 The alleged failure of the EISs to consider mitigation measures as well as certain potential cumulative and synergistic effects does not foreclose later analysis of these factors. Indeed, each EIS expressly provides that the Park Service will, consistent with NEPA, make an environmental assessment regarding any future application for a permit that may be submitted for approval. In its records of decision, in its briefs filed in this court, and at oral argument, the Park Service has represented that it will fully comply with the strictures of NEPA in evaluating future applications for mining operations. Having persuaded the district court that it understands its duty to follow NEPA in reviewing future applications for permits to conduct mining operations, judicial estoppel precludes the Park Service from later arguing that it has no further duty to consider mitigation measures or the cumulative impact of mining in the three parks. See Russell v. Rolfs, 893 F.2d 1033, 1037 (9th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 2915, 115 L.Ed.2d 1078 (1991) (judicial estoppel bars party from making legal assertion which directly contradicts a position taken in the same proceeding or a prior one); Stevens Technical Services, Inc. v. SS Brooklyn, 885 F.2d 584, 588 (9th Cir.1989) ("Judicial estoppel precludes a party from asserting a position in a current legal proceeding which is contrary to the position that party previously asserted in another.").
 
 
 28
 If the Park Service determines that the cumulative impact of a proposed mining operation is not significant, the Park Service has committed itself to issue an EA and a finding of no significant impact as required by NEPA. 40 C.F.R. § 1508.13. If the impact on the environment is significant, the Park Service will be required to prepare an EIS. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.11. Whether an EA or an EIS is issued, the Sierra Club will have an opportunity to comment and seek judicial review if NEPA has been violated.
 
 
 29
 The Sierra Club argues that because future EAs and EISs will be "tiered" to the present EISs, they will inevitably incorporate the EISs' alleged methodological errors. The EISs, however, expressly state that mitigation measures and the cumulative effects of specific mining operations will be considered in further detail when a specific application for a permit to conduct mining operations is submitted for approval. "We cannot assume that government agencies will not comply with their NEPA obligations in later stages of development." Conner, 848 F.2d at 1448.
 
 
 30
 Under the rule of reason, we conclude that the EISs demonstrate that the Park Service has complied with NEPA "to the fullest extent possible" in dealing with hypothetical actions that may or may not be taken in managing future attempts to exercise mining rights in the park. Accordingly, the district court did not abuse its discretion in dissolving the injunction.
 
 
 31
 AFFIRMED.
 
 
 
 *
 Honorable John G. Davies, United States District Judge for the Central District of California, sitting by designation