SALMON RIVER CONCERNED CITIZENS, California Coalition for Alternatives to Pesticides, Safe Alternatives for Our Forest Environment, Northcoast Environmental Center, Plaintiffs,

v.

Dale ROBERTSON, Chief Forester United States Forest Service, United States Department of Agriculture, Defendant.

Civ. S–91–217 DFL.

United States District Court, E.D. California.

June 15, 1992.

Duane C. Miller, Miller and Rolfe, Sacramento, Cal., for California Coalition, Northcoast Environmental, Safe Alternatives and Salmon River.

John Gisla, Asst. U.S. Atty., Sacramento, Cal., for Dept. of Agr. and Dale Robertson.

David H. Dun, Dun and Martinek, Eureka, Cal., Gary G. Stevens, Bogle and Gates, Washington, D.C., for California Forestry Assoc.

## ORDER

LEVI, District Judge.

Plaintiffs challenge the sufficiency of the Environmental Impact Statement (EIS) supporting the Regional Forester's decision to authorize the use of herbicides on national forest lands in California and portions of Oregon and Nevada.

### FACTUAL AND PROCEDURAL BACKGROUND

One of the Forest Service's objectives under the National Forest Management Act of 1976 is to produce a continuous supply of timber. The Forest Service seeks to meet this objective through refor-

estation.[1] One impediment to reforestation is the competition the tree seeds and seedlings must endure from other plants for vital resources including soil moisture, nutrients, sunlight and space. The Forest Service, therefore, intervenes to assist tree seedlings through a vegetation management plan. Vegetation management is the manipulation of competing plants on a given site to further reforestation efforts and meet timber yield goals. The Region V Final EIS [2], which is in dispute in this case, evaluates the use of herbicides as part of a vegetation management plan to assist tree seedlings.

The history of the Final EIS for Region V stretches back many years. An EIS for vegetation management was prepared in 1973. The process of updating this EIS was begun in 1981 and led to the release of a Draft EIS in 1983. Public briefings and hearings were held and various comments received. In 1984, while the draft EIS was under review, the Forest Service determined that further study was required before herbicides could be authorized for use. This decision was made in light of several court decisions that required an agency to undertake a worst case analysis concerning the safety of herbicides.[3] On March and April, of 1984, the Chief of the Forest Service and the Regional Forester for Region V placed a moratorium on the use of herbicides in Region V pending completion of a supplemental EIS. A supplement to the draft EIS that specifically addressed the use of herbicides was published in 1986. Responding to court rulings and public comments, the supplement provided a worst case analysis and updated previously considered risks to human health, soils, water quality and wildlife from herbicide use. The supplement was prepared by the Forest Service with assistance from professional consultants, and the draft of the supplement was circulated to interested individuals for comment. The Final EIS, published in December 1988, incorporates and responds to public comments to both the 1983 draft and the 1986 supplement. *See* EIS, vol. 1, pg. ii, vol. 2, pg. I–2.

The Record of Decision (ROD) by the Regional Forester, adopting the recommendation of the Final EIS, was issued on February 27, 1989. Following the internal administrative appeal process, on January 7, 1991, the Secretary of Agriculture issued a final decision affirming the ROD and lifting the moratorium on herbicide use in Region 5.

The Final EIS presents and evaluates eight alternative vegetation management programs, each employing several methods of controlling vegetation, including mechanical, thermal, manual, chemical and biological controls. Each alternative emphasizes a specific objective, such as cost-effectiveness, maximizing timber production, maximizing employment opportunities, preservation of nontimber resources, or minimizing or prohibiting the use of herbicides. Most of the alternatives allow all methods of vegetation control, but emphasize those methods which would achieve the targeted objective. The only alternatives which limit the methods of vegetation management are alternative 3 (which prohibits the application of herbicides) and alternative 4 (which prohibits only the aerial application of herbicides).

The EIS evaluates the effect of each of the eight alternatives on a number of areas including, soil and water quality, air quality, vegetation, timber yields, forest productivity, wildlife, fisheries, endangered animals and plants, human health and safety, cultural resources, and scenic quality. The socioeconomic effects of the various alternatives are evaluated including the econom-

---

1. Reforestation, as defined by the EIS, includes "the reestablishment of trees and promotion of *stand growth to achieve sustained yields of tim*ber and maintain adequate numbers of trees growing at rates that will provide desired levels of multiple-use benefits." EIS vol. 1, S–2.

2. Region 5 is referred to as the Pacific Southwest Region and includes 20 million acres of national forest lands in California, five counties of western Nevada, and one county in southern Oregon.

3. See *Save Our Ecosystem v. Clark,* 747 F.2d 1240 (9th Cir.1984) and *Southern Oregon Citizens Against Toxic Sprays v. Clark,* 720 F.2d 1475 (9th Cir.1983).

ic efficiency and cost of the alternative approaches.

The human health and safety evaluation of the various alternatives considers risks to forest workers and to the public. The EIS includes a lengthy worst case and risk analysis to evaluate the potential health effects from herbicides. This analysis of human health risks has all the outward "indicia of comprehensiveness." *Oregon Environmental Council v. Kunzman,* 817 F.2d 484, 491 (9th Cir.1987). The worst case analysis substitutes for gaps in the existing data concerning, "(1) Health effects of the herbicides seen in humans; (2) Animal studies for certain toxicity endpoints (for example, cancer studies); (3) Exposure studies on humans." EIS at 4–65. To compensate for the gaps in the data, the EIS undertakes a risk analysis that examines the following kinds of potential exposure to herbicides: from normal ground spraying to workers and the public, from normal aerial spraying risks to workers and the public, general and specific risks from abnormal operations, and accident risks. For each of these categories a realistic case, conservative case and worst case exposure is assumed, and the risks calculated accordingly. The estimates are based upon exposure caused by spray drift, by contact with dried herbicide on vegetation, by ingestion of food or water contaminated in aerial or ground applications, and by inhalation by persons who burn contaminated firewood. *Id.* at 4–80. The EIS attempts to cumulate the doses a person might receive through different routes, for instance adding the spray drift exposure to the contaminated food and water dose. The maximum exposed individual (MEI) dose combines the risk from spray drift, inhalation of vapor from burning contaminated firewood, and the contaminated food and water dose. Finally, the lifetime exposure risk for a 70–year lifetime is calculated for analysis of cancer risk. In this analysis, the EIS assumes that in the realistic case a member of the public might be exposed to spray drift three times in a 70–year lifetime, six times in the conservative case, and nine times in the worst case. Another estimate of lifetime cancer risks

for hikers or backpackers in the sprayed areas assumed 70 to 700 exposures in a 70 year lifetime.

Based upon its evaluation of the different alternative vegetation management techniques, the Final EIS selects a recommended alternative that emphasizes local management and permits local forest managers to use herbicides where essential to achieve resource management objectives. In the ROD the Regional Forester adopted the alternative recommended in the EIS. In reaching this decision the Regional Forester relied on five considerations:

(1) should treatment method selection authorities, historically delegated to the National Forests, be wholly or partially withdrawn to the Regional level?; (2) effects of herbicides on health risk to the general public and workers; (3) effects on nontimber resources; (4) effects on timber yield and their influence on employment and local economies; (5) feasibility of implementation.

ROD at 2.

The EIS is a programmatic statement that provides general guidance to the national forests in Region V on appropriate vegetation control during reforestation projects. The EIS does not initiate or compel any treatment projects. By emphasizing the discretion of local forest managers, the EIS leaves the decision whether to use herbicides to the local manager. The EIS intends that site-specific analysis, including environmental analyses, will be part of any actual project planning.

Plaintiffs challenge the ROD arguing that the EIS fails to adequately disclose and analyze the human health risks from inert ingredients and cumulative effects, and the risks to chemically sensitive individuals. These arguments were previously advanced by plaintiffs in their administrative appeal of the ROD. The Secretary denied the appeal in a lengthy decision dated January 7, 1991.

## ANALYSIS

The National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq. re-

quires the preparation of an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). NEPA sets forth "action-forcing" procedures designed to fully inform agency decision-makers of the environmental impact of their decisions. *Trustees for Alaska v. Hodel*, 806 F.2d 1378, 1382 (9th Cir.1986). The reason for the EIS requirement is that "decisions that are based on understanding of the environmental consequences" will "protect, restore and enhance the environment." 40 C.F.R. § 1500.1(c). An EIS must compile "full and fair" information on the significant environmental impacts and alternatives of the proposed action. 40 C.F.R. § 1502.1. The purpose of the draft EIS is to "inform decision-makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.[4] Thus the EIS is intended to "provide decision makers with enough information to aid in the substantive decision whether to proceed with the project in light of its environmental consequences and to provide the public with information and an opportunity to participate in gathering information." *Northwest Coalition for Alternatives to Pesticides v. Lyng*, 673 F.Supp. 1019, 1022 (D.Or.1987).

## A. Standard of Review

■ The district court reviews an EIS to determine whether it was prepared by the Forest Service in accordance with the procedure required by 5 U.S.C. § 706(2)(D).[5] The Ninth Circuit employs a "rule of reason": An EIS must contain a "reasonably thorough discussion of the significant aspects of the probable environmental consequences" and make a rea-

soned decision. *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1519 (9th Cir.1992). "The reviewing court may not substitute its judgment for that of the agency concerning the wisdom or prudence of a proposed action." *Oregon Environmental Council v. Kunzman*, 817 F.2d 484, 492 (9th Cir.1987). "A reviewing judge must make 'a pragmatic judgment whether the EIS's form, content and preparation foster both informed decision-making and informed public participation.... Once satisfied that a proposing agency has taken a "hard look" at a decision's environmental consequences, the review is at an end.'" *Mumma*, 956 F.2d at 1519, quoting *State of California v. Block*, 690 F.2d 753 (9th Cir.1982). "The reviewing court may not 'fly speck' an EIS and hold it insufficient on the basis of inconsequential, technical deficiencies." *Kunzman, supra*, 817 F.2d at 492.

■ Moreover, in reviewing an EIS, the court should give latitude to the agency to rely upon its own experts.[6] "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 1861, 104 L.Ed.2d 377 (1989). "NEPA does not require that [the court] ... resolve disagreements among various scientists as to methodology.... Our task is simply to ensure that the procedure followed by the [agency] resulted in a reasoned analysis of the evidence before it, and that the [agency] made the evidence available to all concerned." *Oregon Environmental Council v. Kunzman*, 817 F.2d 484, 496 (9th Cir.1987).

---

**4.** The draft and final environmental impact statements must be circulated to: (1) any federal agency with jurisdiction or special expertise with regard to any environmental impact; (2) any federal, state or local agency responsible for development or enforcement of environmental standards; (3) the applicant, if any; (4) any person organization or agency requesting the statement; and (5) any person, organization or agency which submitted substantive comments to the draft statement. 40 C.F.R. § 1502.19.

**5.** A reviewing court must "hold unlawful and set aside agency action, findings, and conclusions found to be without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

**6.** In this case, the agency's experts are highly qualified, even eminently so, in the areas in which they specialize.

## B. *Standing and Ripeness*

■ Defendant argues that plaintiffs have no standing to assert these claims and that plaintiffs' claims are not ripe for adjudication. Defendant's standing and ripeness arguments are of a piece. Defendant suggests that this EIS is merely a programmatic EIS setting Forest Service policy. Defendant argues that plaintiffs suffer no injury and have no present case or controversy when challenging a programmatic EIS and may only challenge the site-specific environmental assessment ("EA") which irretrievably commits resources.

This argument was recently rejected by the Ninth Circuit in *Idaho Conservation League v. Mumma,* 956 F.2d 1508 (9th Cir.1992). The court held that requiring plaintiffs to wait until a government agency acts on a specific project would not yield an adequate remedy, particularly since the challenge to the site-specific action would be subject to the defense that the overall plan had been approved. *Id.* at 1519. "To the extent that the plan pre-determines the future, it represents a concrete injury that plaintiffs must, at some point, have standing to challenge. That point is now or it is never." *Id.* at 1516. In light of the decision in *Mumma,* plaintiffs have standing to challenge the programmatic EIS and their claims are now ripe.[7]

## C. *Cumulative Impact*

Plaintiffs assert that the EIS inadequately analyzes the cumulative impact of the use of herbicides in vegetation management. Plaintiffs assert that the EIS fails to consider other users of herbicides and the effects of long term exposures to all chemicals. The Forest Service asserts that cumulative effects are best studied in relation to specific projects and that therefore it may properly defer assessment of cumulative impacts until the preparation of site-specific Environmental Assessment's (EA's) or EIS's, under the principle of tiering.[8] The Forest Service also argues that any cumulative impacts from other herbicide users or exposures are sufficiently accounted for as part of the methodology used in the risk analysis which assumes that the herbicides are more dangerous than the data indicates and that the exposures are greater than expected.

■ NEPA requires that cumulative or synergistic effects be considered in an EIS.[9] *Kleppe v. Sierra Club,* 427 U.S. 390, 411, 96 S.Ct. 2718, 2730, 49 L.Ed.2d 576 (1976); *City of Tenakee Springs v. Clough,* 915 F.2d 1308, 1312 (9th Cir.1990); 40 C.F.R. § 1508.25(c)(3). Agencies are encouraged to tier[10] their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review. 40 C.F.R. § 1502.20; *Southern Oregon Citizens v. Clark,* 720 F.2d 1475 (9th Cir.1983) (permitting the BLM to consider worst case analysis of scientifically uncertain issues in an

---

**7.** To the extent that the EIS defers consideration of certain environmental impacts to a site specific environmental assessment or supplemental EIS, plaintiffs will have a further opportunity to challenge the use of herbicides in any specific location. Nonetheless, those matter which are considered and evaluated in the Final EIS, and which are not deferred for a second tier review, are now ripe for review and plaintiffs have standing.

**8.** At oral argument counsel for the Forest Service noted that site specific analysis might be either an EA or an EIS. Transcript at 7.

**9.** "'Cumulative impact' is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. 1508.7

**10.** Tiering is defined in 40 C.F.R. § 1508.28 as "the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared.... Tiering is appropriate when it helps the lead agency to focus on the issues which are ripe for decision and exclude from consideration issues already decided or not yet ripe."

nual EA rather than preparing a new or supplemental EIS).

■ The court finds that defendant's use of tiering is appropriate in this case. Certain issues are best considered at different stages of a project. To undertake a study of cumulative impacts due to other herbicide users and other exposures to chemicals, on a region wide basis, of a region consisting of some 20 million acres, at the programmatic level when no decision to use herbicides had yet been reached by local forest managers, would be burdensome, hypothetical, and unproductive. Certainly, it is not arbitrary or capricious to consider the cumulative impact of other users or exposures on a site-specific basis. A decision-maker at the project level can more easily evaluate the type and amount of herbicide to be used, the method and number of applications, the number of acres involved, topography, soil consistency of the acres to be affected, the number and proximity of persons residing in the vicinity, and the identity of other potential users.

Plaintiffs argue that an agency may not tier, and thereby defer, its evaluation of environmental impacts, if it is possible to consider the impacts at the programmatic level. *Thomas v. Peterson*, 753 F.2d 754, 759 (9th Cir.1985). However, the detailed analysis of cumulative and synergistic effects may be unwarranted when a government agency has not yet authorized or recommended approval of a specific project. *See Northern Alaska Environmental Center v. Lujan*, 961 F.2d 886 (9th Cir.1992) (holding that an EIS's deferral of consideration of certain potential cumula-

tive and synergistic effects is proper tiering and does not foreclose later analysis of these factors in a future EA). A cumulative impact discussion need only be adequate for the purpose of evaluating the eight vegetation management alternatives. *See id.* The Forest Service represents that it will disclose and discuss cumulative impacts of herbicides at a later time prior to application. Whether this discussion will be sufficient in an EA or whether a supplemental EIS is required is left to another day.[11] Judicial estoppel precludes the Forest Service from later arguing that it need not consider the cumulative impacts of herbicide use. *See id.* at 891; *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir.1990).

■ Plaintiffs concede that a much more specific analysis can be done at the forest level but argue that the EIS fails to include a sufficient discussion of risk from exposure to chemicals from other sources. Using a pragmatic approach and the rule of reason, the court finds that this objection is not fatal to the EIS. According to the Forest Service's professional experts, the EIS's use of a worst case analysis, for exposure to herbicides sprayed by the Forest Service, adequately takes into account exposures from other sources. By assessing a risk greater than average in exposure amount and toxic effect, the EIS provides sufficient guidance as to the possible cumulative effects from other sources and sufficient guidance to permit a reasonable choice among the alternatives evaluated. Although a more direct discussion of other sources of exposure would have been preferable,[12] if only to incorporate by reference

11. Although acknowledging that cumulative impacts cannot be studied over the whole of Region V, the Environmental Protection Agency ("EPA") criticizes the Final EIS for lacking cumulative risk assessment, particularly of the cumulative impact on watershed and air basin quality. The EPA states that an intermediate NEPA document is needed in order to ensure that the cumulative impact analysis issues are adequately addressed. EPA Comments, April 1989. Moreover, "EPA believes that, traditionally, site-specific Environmental Assessments (EA) have ignored cumulative impacts. By their very nature they tend to be limited to a narrow focus." *Id.*

Site specific EA's or EIS's prepared prior to particular herbicide applications must consider cumulative effects in light of other herbicide applications by the Forest Service or other entities and must consider any cumulative effects resulting from the site specific application, even those effects occurring beyond the site area—for example, in a watershed or air basin.

12. The EIS acknowledges the likelihood of other exposures to herbicides. See, e.g., EIS at 4–114 ("the diets of exposed people may have some influence on the toxicity of the herbicides. This is one of several factors that may influence the sensitivity of individuals"); 4–71 ("it would be very difficult to identify a sample population

the analysis and discussion of data gaps for human risks from forest service herbicide applications, the approach adopted is sufficient to pass the rule of reason for a programmatic EIS. *See Oregon Environmental Council v. Kunzman,* 614 F.Supp. 657, 662 (D.C.Or.1985), *affirmed and adopted,* 817 F.2d 484, 495 (9th Cir.1987).[13] In short, the court concludes that both the worst case assessment, and the discussion in the EIS justifying the use of a worst case approach, serves adequately to address the question of other sources and exposures to herbicides.

■ The EIS also adequately addresses the synergistic effects of various chemicals at a programmatic stage of analysis. In *Kunzman,* an EIS which simply disclosed that the actual synergistic effects of the pesticide were unknown was found adequate. 614 F.Supp. at 662. Here the EIS defines a synergistic effect and discusses the improbability of a synergistic effect and the unlikelihood of exposure to multiple herbicides. *See* EIS at 4–112–114. This discussion is sufficient to inform the public and the decision-maker of the synergistic impacts relevant at a programmatic stage.

D.  *Risks due to Inert Ingredients*

■ Plaintiff asserts that the toxic and synergistic effects of the inert ingredients of the proposed herbicide formulations are not adequately disclosed in the Final EIS. Defendant asserts that this information is not necessary because the worst case risk for active ingredients, which is studied, was overstated, thus encompassing any potential risk from inerts.

In preparation of the EIS, the Forest Service requested manufacturers and the EPA to identify inert ingredients in the formulations of herbicides under evaluation. The EPA identified only those inert ingredients on Lists 1 and 2,[14] inerts of toxicological concern or first priority for further testing. Inerts of unknown toxicity, were not identified or analyzed in the programmatic EIS. Decl. of Gross.

The Ninth Circuit found a similar discussion of the risks inherent in inert ingredients adequate in *Northwest Coalition for Alternatives to Pesticides v. Lyng,* 844 F.2d 588, 597–8 (9th Cir.1988). In *Northwest,* the government acknowledged the presence of inerts in the proposed herbicide formulation and asked the EPA to determine whether any of the inert ingredients were harmful or potentially harmful. The EPA reported that Esteron–99 contains kerosene, a potentially toxic inert, but declined to identify other inerts in conformity with its policy classifying inert ingredients as "Confidential Business Information." The government in *Northwest* disclosed that only the toxicity of the active ingredients, and not that of either the formulations or the inerts had been analyzed, but concluded that the primary risk was the active ingredient and that the overstatement of risk contained in the analysis of the risk of the active ingredient adequately described the overall risk of the formulations as well. The court in *Northwest* agreed and found that the disclosure and analysis was sufficient under NEPA.

Plaintiffs argue that this case is not governed by *Northwest* since the record demonstrates that the identities of the inert

that would be large enough to differentiate between cancer induced by exposure to an herbicide and that caused by exposure to other environmental factors, such as diet, smoking, polluted air, or drinking water"); 4–118 ("cumulative exposure also could occur if an individual used an herbicide on a garden or lawn at the same time he was exposed to an herbicide from the spray program described in this EIS").

13.  The Forest Service should react cautiously to this holding that this portion of the programmatic EIS is adequate. The court accepts the representation that a thorough analysis of cu-

mulative impacts is forthcoming at a later stage when the decision to apply herbicides is reached by local forest managers.

14.  The EPA classifies inert herbicide and pesticide ingredients into four lists: List 1 contains 55 inerts considered "inerts of toxicological concern;" List 2 contains 50 chemicals considered "potentially toxic inerts, with a high priority for testing;" List 3 contains 800 chemicals considered "inerts of unknown toxicity;" and List 4 contains 300 "inerts of minimal concern." *See* 55 Fed.Reg. 33762 (August 17, 1990); EIS at 4–116—4–117.

ingredients could be obtained. However, the declarations of the Forest Service's experts and the plaintiffs' experts are in conflict as to (1) whether any meaningful information concerning the inerts was readily available, and (2) whether an inquiry into the inerts ingredients has any importance. Because the agency is entitled to rely on its experts, the court does not find Northwest distinguishable on the basis suggested. The Forest Service also states that information concerning the inert ingredients is now available and will be revealed in the tiered assessment to be undertaken when any particular application of an herbicide is contemplated.[15]

### E. *Chemically Sensitive Individuals*

■ Plaintiffs argue that the Final EIS fails to provide "full disclosure" of environmental impacts of herbicide use because it does not adequately describe how persons with multiple chemical sensitivities ("MCS") or hypersensitive individuals will be affected by herbicide use.[16] Defendants contend that MCS syndrome is not a scientifically definable or verifiable hypothesis, and that the causation and risks plaintiffs attribute to MCS are speculative. Defendants further contend that they are not obligated to discuss all speculative impacts or theories advanced by any expert.

The EIS expressly considers effects on sensitive individuals. It identifies factors that affect the sensitivity of individuals, considers allergic hypersensitivity, and discusses the likelihood of effects in sensitive individuals. EIS at 4–114–116. The EIS notes that:

> Based on the current state of knowledge, individual susceptibility to the toxic effects of the 13 herbicides cannot be specifically predicted.... Safety factors have traditionally been used to account for variations in susceptibility among

people. The margin-of-safety approach used in the risk assessment takes into account much of the variation in human response ... [A] safety factor of 10 is used for interspecies variation, an additional safety factor of 10 is used for within-species variation. Thus, the normal margin-of-safety of 100 for both types of variation is sufficient to ensure that most people will experience no toxic effects. However, unusually sensitive individuals may experience effects even when the margin of safety is equal to or greater than 100.... In particular, in instances of the risk assessment where margins of safety are less than 100 for an exposure to a particular herbicide, it is possible that an exposed sensitive individual would experience toxic effects, whereas the average person would not. It must be noted, however, that sensitive individuals compose only a fraction of the population at large and it is not likely that a sensitive individual would be among those few people who might be exposed in any of the Forest Service's applications.

EIS at 4–115–116.

■ The court finds that the discussion of the effects of herbicide use on sensitive individuals is adequate. An EIS need not quantify every risk, particularly less likely risks. Moreover, the risk analysis used by the government, a margin of safety of 100, is the scientifically accepted method. The scientific uncertainty regarding the cause and extent of the risks, while not dispositive, does reduce the detail which the EIS can reasonably provide.

The EIS's discussion of the risk to chemically sensitive individuals, although not thorough, satisfies the rule of reason.

### CONCLUSION

Plaintiffs have standing to assert their challenges to the sufficiency of the Final

---

**15.** The court suggests that the Forest Service would do well to specifically address the effects of the inerts, if any, now that their identity may be known.

**16.** Plaintiffs define MCS as a "syndrome where individuals experience adverse, often debilitating, acute and chronic health effects when exposed to *any* amount of an offending substance.

Hypersensitivity describes those people whose immune systems have become highly sensitized to herbicides (or other chemicals) and who experience adverse health effect to *minute* amounts, even order of magnitude less than would affect the average person." Plaintiff's Response and Reply at 29, n. 25.

EIS and ROD of December 1988. The challenge to the disclosure of risks to chemically sensitive individuals is rejected. The claim that the EIS fails adequately to evaluate inert ingredients must be denied. Finally, the assertion that cumulative effects must be more carefully examined is denied at the programmatic stage. The court finds that the "EIS's form, content, and preparation foster both informed decision-making and informed public participation." *Mumma*, supra, 956 F.2d at 1519. Plaintiffs' motion for summary judgment and injunctive relief is denied and defendants motion for summary judgment is granted.[17]

IT IS SO ORDERED.

---

**17.** While this motion was pending, the parties filed a renewed round of briefing concerning plaintiffs' motion for preliminary injunction. This court has not considered these pleadings in preparing this opinion but has confined itself to the pleadings submitted for the summary judgment motions. Those pleadings were already voluminous.